1

KEVIN V. RYAN (SBN 118321)
United States Attorney
JOANN M. SWANSON (SBN 88143)
Chief, Civil Division
JONATHAN U. LEE (SBN 148792)
Assistant United States Attorney

2

3

4

450 Golden Gate Avenue, Tenth Floor
San Francisco, California 94102
Telephone:         (415) 436-6909
Facsimile:          (415) 436-6748
Email: jonathan.lee@usdoj.gov

5

6

7

UNITED STATES DISTRICT COURT

8

NORTHERN DISTRICT OF CALIFORNIA

9

SAN FRANCISCO DIVISION

10

11

TRADER SPORTS, INC. dba THE
TRADERS,

No. C 06-001136 VRW

12

Plaintiff,

**MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION**

13

v.

14

15

ALBERTO GONZALES, Attorney General,
United States Department of Justice, CARL
J. TRUSCOTT, Director, Bureau of
Alcohol, Tobacco, Firearms and Explosives,
United States Department of Justice, MARY
LERCH, Director of Industry Operations,
San Francisco Field Division, Bureau of
Alcohol, Tobacco, Firearms and Explosives,
United States Department of Justice,

Date: May 25, 2006
Time: 2:00 p.m.
Dept.: 6
Judge: Hon. Vaughn R. Walker

16

17

18

19

Defendants.

20

21

_____

22

_____

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In this action for de novo review the revocation of a Federal firearms license for systemic, pervasive recordkeeping violations, including the inability of the licensee Trader Sports to account for nearly 2,000 weapons in its inventory during a 2003 inspection, Trader Sports brings this motion for preliminary injunction to stay the effective date of the license revocation.  The motion should be denied.

First, this action follows inspections by the Bureau of Alcohol, Tobacco and Firearms (" ATF") in 2000, 2002 and 2003.  These inspections revealed hundreds if not thousands of recordkeeping violations at Trader Sports.  These violations represent a blatant disregard for the statutory scheme devised by Congress to require firearms licensees to track the acquisition and disposition of each firearm meticulously, to keep firearms out of the hands of those who would do harm with the firearm and to aid law enforcement efforts to investigate crimes already committed.  Over the past two decades or more, Trader Sports has indicated its awareness of these requirements in writings signed by its principal owner, Anthony Cucchiara. ATF specifically warned Trader Sports that its continued blatant disregard of laws and regulations governing firearms dealers would not be tolerated.  Following the 2003 inspection, which revealed the same kind of significant, repeated violations by Trader Sports, the ATF issued the notice of revocation of Trader' s license that has led to this action.

As a result, Trader Sports has failed to show that it will likely prevail on the merits; in fact, the record evidence from the underlying administrative hearing confirms thousands of violations of the Federal regulatory scheme.  Trader Sports has instead attempted to construct challenges to the administrative process based on constitutional principles not applicable to this civil proceeding.  The facts do not support application of the exclusionary rule, using a Fourth Amendment analysis from criminal procedure, to the underlying regulatory inspections. Trader Sports complains that because the ATF conducted a closing conference on September 27, 2002, the September 2, 2003 inspection violated a statutory provision limiting ATF to " inspection" of licensee' s records and inventory once in any 12 month period.  The

September 27, 2002 conference was a meeting to discuss the inspection findings. The actual inspection of records and inventory occurred in July and August 2002. When Trader Sports requested a postponement of the closing conference, ATF accommodated the request. ATF did not inspect any inventory or records on September 27, 2002. Even if it had, the exclusionary rule is an extreme sanction imposed in criminal prosecutions under appropriate circumstances. There is no authority to justify imposition of the sanction in this civil proceeding.

Likewise, Trader's due process arguments ring hollow. Trader Sports did not have a right to compulsory process, cross-examination of witnesses, application of the rules of evidence, or even rulings on objections in this administrative hearing context. Trader Sports had the opportunity to call witnesses favorable to its case and present evidence to support its claim that the thousands of recordkeeping violations were not willful, but it chose to present its case without live testimony. The same rules applied to the ATF, which could not cross-examine Trader's declarants because they did not personally appear. Furthermore, Trader's attack on the ATF attorney's role is inappropriate. There is no evidence that the hearing officer or the ATF decisionmaker reached anything other than their own personal conclusions about Trader's willful violations of the firearms regulations.

Therefore, Trader Sports has not shown that it has raised sufficiently serious questions about the merits to justify the requested injunctive relief.

As for the balance of hardships, what Trader Sports completely ignores is the public interest in effective regulation of Federal firearms licensees and their compliance with recordkeeping requirements. Every court to consider this issue has come down firmly on the side of requiring licensees to " sweat the details" of full compliance, so that the twin objectives of public safety and law enforcement are advanced to the fullest extent possible. Despite its claim that it has invested significant sums to clean up its act, based on firearm trace request information since 2003, Trader Sports sells a significant number of firearms that are recovered by law enforcement within a few months at a criminal event. In the past three years, Trader Sports has had nineteen unsuccessful trace requests, meaning that it is unable to provide the responsive information about acquisition or disposition of a firearm when asked to by law

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

enforcement.  By comparison, the largest retail location in the state, a chain store from Southern California, had just one unsuccessful trace in that same time period.  The public interest favors revocation of this license for the numerous and pervasive recordkeeping violations shown at the hearing.

Against this vital public interest, Trader Sports claims its hardships include loss of business goodwill, employment for its workers, value to its inventory, market for its products, and value to its premises.  These are economic claims that are compensatory damages, and they are self-inflicted injuries, caused by Trader Sports repeated indifference to the firearms regulatory scheme as well as its failure to act over the past six months to mitigate the effect of the revocation.  As such the claims do not justify a preliminary injunction.

As for the requested stay, again the public interest is very high in denying the stay, for the same reasons set forth herein.  The motion for preliminary injunction and for a stay of the license revocation should be denied.

## STATEMENT OF FACTS

### A.  Regulatory Scheme

Congress expressed its concern with widespread trafficking in firearms and their general availability to those whose possession of firearms was contrary to the public interest with the passage of the Omnibus Crime Control and Safe Streets Act of 1968 ("1968 Act").  The 1968 Act's provisions were designed to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2113.

To further these vital public interests, Congress decided to subject Federal Firearm Licensees to several major recordkeeping requirements and it is unlawful for a firearms dealer to " fail to properly maintain any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated hereunder." 18 U.S.C. § 922(m).

First, a licensed dealer must maintain a record of the acquisition and disposition of every firearm that enters or leaves its inventory. 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.22(a)(3) and 478.125(h).

Second, firearm dealers are required to complete a Firearms Transaction Record (Form

4473) for every firearm that they sell to a non-licensee. 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.125(e).  Licensees are required to verify the information provided by the prospective purchaser on the 4473, including confirming their address information with a valid identification.  The licensee must maintain the fully completed form 4473s in alphabetical, chronological order.

Federal firearms licensees must complete ATF form 4473, including verifying the purchaser's identity and other pertinent information and recording contact with a national database regarding the buyer's criminal background. 27 C.F.R. §§ 478.21(a), 478.124.  Form 4473s must be maintained by the licensee in alphabetical, chronological or numerical order. 27 C.F.R. § 478.124(b).  If a buyer's response to a required question, such as whether the person is under indictment, disqualifies the buyer from the transaction, the licensee is required to halt the transaction. 27 C.F.R. § 478.99.   If a background check yields disqualifying information about the purchaser, the licensee must not complete the transaction. Id.  If the background check is more than thirty days old, the licensee must re-initiate a current background check. 27 C.F.R. § 478.102©

Third, before transfer of semi-automatic assault weapons or firearms with large capacity ammunition feeding devices, the licensee is required to obtain certain information from the purchaser, under penalty of perjury, and a certification from a supervisor in the law enforcement agency on agency letterhead, in order to ensure the weapons are for official law enforcement use only.  18 U.S.C. §§922(v) and (w); 27 C.F.R. § 478.132(a).

Fourth, if a licensee participates in multiple sales of firearms to the same transferee, the licensee must report the multiple sales on ATF form 3310.4. 18 U.S.C. §§922(m) and 923(g)(3); 27 C.F.R. § 478.126a.   Regulations require that this form be submitted to ATF and local law enforcement no later than the close of business of the day of the multiple sale.

Fifth, licensees must respond to requests from the National Tracing Center accurately and within 24 hours. 18 U.S.C. §923(g)(7); 27 C.F.R. § 478.25a.   The National Tracing Center requests information on firearms recovered by law enforcement.  National Tracing Center assist law enforcement in efforts to investigate crimes committed with firearms.

Courts have consistently upheld this regulatory scheme.[1]

**B. Trader Sports' Licensing History**

Trader Sports is one of the largest Federal Firearms Licensees in California. (USA05312)[2] Its sole shareholder is Anthony Cucchiara, who has operated the Trader sporting good store since 1958. <u>Id</u>.  He was first licensed under the Federal Firearms Act of 1939, 15 U.S.C. 901-910, under licensees were not required to obtain or verify identification of firearms' purchasers. (USA00066)  In October 1968, Mr. Cucchiara obtained his license under the 1968 Act, 18 U.S.C. 923. <u>Id</u>.

1.    1978 Revocation

Anthony Cucchiara was first subject to an adverse administrative action on his prior

---

[1]<u>Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives</u>, 348 F.Supp.2d 1299, 1309 n. 14 (S.D. Ala. 2004) (scheme obligates licensees to "sweat the details" to ensure compliance with the Act), <u>aff'd</u>, 415 F.3d 1274 (11th Cir. 2005); <u>3 Bridges, Inc. v. United States</u>, 216 F.Supp.2d 655, 659 (E.D. Ky. 2002)(if dealer does not properly maintain records to ATF's exact specifications, ATF's ability to fulfill legislative mandate may be compromised); <u>RSM, Inc. v. Herbert</u>, No. WMN 05-847 (D. Md. Feb. 23, 2006)(policy objectives of scheme "strongly militates" in favor of "total compliance as a condition of retaining the privilege of dealing in firearms"); <u>Strong v. United States</u>, Civil Action 3:04-CV-2626L, 2006 U.S. Dist. LEXIS 9961 (N.D. Tex. Mar. 13, 2006); <u>E & B Sporting Goods v. McCarron</u>, No. 3:04-CV-1535 JCH, 2006 U.S.Dist. LEXIS 8076 (D. Conn. Feb. 21, 2006); <u>Edward Kuss dba The Hock Shop v. ATF</u>, No 7:04-543, 2005 U.S. Dist. LEXIS 28773 (E.D. Ky. Nov. 18, 2005); <u>On Target Sporting Goods, Inc. v. Attorney General of the United States</u>, No. 4:04-CV-1644 (E.D. Mo. Dec. 21, 2005); <u>Clust, Inc., dba Cash To Go Pawn Shop v. ATF</u>, No. 2:04-cv-839, 2005 WL 1651794 (S.D. Ohio July 13, 2005); <u>Pinion Enterprises, Inc. dba The Gun Cellar v. Ashcroft</u>, 371 F.Supp.2d 1311 (N.D. Ala. June 3, 2005); <u>Bruce Jennings, et. al. v. Ashcroft</u>, No. CV-N-03-0284 (D.Nev. July 22, 2005); <u>Article II Gun Shop dba Gun World v. Ashcroft</u>, Civil Action 03-C-4598, 2005 WL 701053 (N.D. Ill. March 25, 2005), <u>aff'd</u>, <u>Article II Gun Shop, Inc. v. Gonzales</u>, 441 F.3d 492 (7th Cir. Ill. 2006); <u>Appalachian Resources Development Corp. v. McCabe</u>, 387 F.3d 461 (6th Cir. 2004); <u>Mansfield v. ATF</u>, Civil Action No. AW-03-3022 (D. Md. Aug. 23, 2004); <u>Gray Highway Pawn, Inc. d/b/a Shurlington Jewelry & Pawn v. ATF</u>, 5:03-CV-267-1 (DF) (M.D. Ga. Aug. 6. 2004); <u>Edwards v. ATF</u>, A04-001 CV (JWS) (D. Ak. Aug. 10, 2004); <u>Blaustein & Reich, Inc. v. Buckles</u>, 220 F. Supp. 2d 535 (E.D. Va. 2002), <u>aff'd</u>, <u>Blaustein & Reich, Inc. v. Buckles</u>, No. 02-2329 (4th Cir. Apr. 21, 2004); <u>Cucchiara v. Secretary of the Treasury</u>, 652 F.2d 28, 29 (9th Cir. 1981) attached as Appendix of Authorities (see Docket #10).

[2]References to pages marked "USA00001-4155 and 5000-5970" are 13 volumes of exhibits (see docket #12) from the underlying administrative proceedings.

Federal firearms license in 1978. Id.  On May 2, 1978, the government issued a Notice of Denial of Mr. Cucchiara's license renewal application. Id. On June 27, 1978, Mr. Cucchiara received a hearing on the denial. Id.  On September 14, 1978, ATF Regional Regulatory Administrator Charles D. Foster issued a final Notice of Denial of his application to renew his firearms dealer license. Id.  On November 9, 1978, Mr. Cucchiara petitioned for a *de novo* review of the denial of the application. Id; Request for Judicial Notice (" RJN") at USA05972-75.[3]  On October 19, 1979, United States District Judge Conti granted the government's motion for summary judgment on the petition. Id.; RJN at USA06037-39.  Judge Conti's order granting summary judgment stated in pertinent part:

> After a careful de novo review of the entire record, the court finds on the basis of the uncontroverted evidence that plaintiff, since at least 1972, has been fully aware of the legal obligations of federal firearms licensees; that during the life of his license he failed on many scores of occasions to observe legal requirements; that the nature and extent of his noncompliance with legal requirements, especially in the area of sales to ineligible purchasers where the public interest in strict, painstaking compliance is particularly great, evince gross disregard of or indifference to legal requirements; and the Secretary's refusal to renew his license was therefore authorized within the meaning of 18 U.S.C. § 923(f)(3). (USA06039)

Mr. Cucchiara's motion to stay the judgment pending appeal was denied by the District Court. Id.; Declaration of Jonathan U. Lee, Exh. A.  The Ninth Circuit upheld the denial of the renewal of this firearms license.  Cucchiara v. Secretary of the Treasury, 652 F.2d 28, 29 (9th Cir. 1981) (licensee "repeated[ly] fail[ed] to record acquisition and disposition of firearms and a loss without reasonable explanation of 200 firearms.") (Appendix of Authorities #17).

   2.   1983 License with Conditions

      On November 28, 1979, Mr. Cucchiara's long time employee, Everett Studley, applied for a license purportedly to take over Mr. Cucchiara's business. (USA00066)  On December 3, 1979, Mr. Studley, while still Mr. Cucchiara's employee, formed a California corporation named Studley Arms, Inc., he began selling firearms without first obtaining the required federal firearms license for the new corporation. (USA00066-67)  On December 4,

---

[3]References to pages marked "USA05971-6178" are to the Request for Judicial Notice (see docket #11) from two earlier cases filed by Trader Sports' principal owner and his alter ego.

1979, Mr. Studley applied for and obtained a firearms dealer license as a sole proprietor valid for one year. Mr. Studley's renewal application was denied, but Studley Arms, Inc. Later submitted its own application.  On March 17, 1981, a Notice of Denial for its new license application was issued to Studley Arms, Inc., on its February 1981 application for a firearms license.  After a hearing, the ATF issued Final Notices of Denial to Mr. Studley and Studley Arms on June 25, 1981.  Id.  On August 20, 1981, Mr. Studley and Studley Arms, Inc. petitioned for *de novo* review of the denial of their firearms dealer license applications. (USA00067)  On October 2, 1981, Mr. Cucchiara filed a civil action for civil rights damages. Id.

On January 28, 1983, United States Judge Lynch granted the government's motion for summary judgment on the petition for *de novo* review of the application denials. Id.; RJN at USA06135-37.  Judge Lynch's order stated in pertinent part:

> Upon review of the record, this Court finds substantial, if not overwhelming, evidence that Mr. Studley was not acting as the sole proprietor, but rather as a subterfuge to allow Mr. Cucchiara to improperly continue in the firearm business...It is clear that BATF's refusal to renew Mr. Studley's license and its denial of the application of Studley Arms, Inc. were proper.  (USA06136)

On February 14, 1983, ATF Regional Regulatory Administrator Joseph D. Deviney, wrote to Mr. Cucchiara outlining the conditions precedent to be met by Mr. Cucchiara and his nominee, Mr. Studley in order for ATF to consider exercising its discretion to grant a firearms license to Mr. Cucchiara.  One of these conditions was:

> (11)   Mr. Cucchiara concedes that his former Federal Firearms License was not renewed in 1979 because of inadequate and improper firearm records; and upon receipt of a Federal Firearms License after April 14, 1983, he will fully comply with all recordkeeping requirements imposed by law and regulation on such licensee.

(USA00083)  Mr. Cucchiara and Mr. Studley each countersigned Mr. Deviney's letter "[t]o demonstrate their agreement with each condition and willingness to comply therewith..." Id.  On March 31, 1983, Judge Lynch dismissed Mr. Cucchiara's civil action with prejudice. RJN at USA06861.  On April 15, 1983, Mr. Cucchiara received a firearms license # FFL No. 9-94-001-E4-22578 as a sole proprietor. (USA00068)  On April 17, 1983, Studley Arms, Inc. filed a name change with the State of California to become, Trader Sports, Inc., the present Licensee. Id.  On July 31, 1983, the Licensee was issued its new firearms license, No. 9 94-001-01-5H-23067. Id.

3.      Inspection History Related to 2004 Revocation

a.      2000 Inspection

On June 27, 2000, ATF gave its inspection results to Trader Sports. (USA04092-98)
The inspection revealed violations of regulations governing federal firearms licensees. Id.
Trader's acquisition and disposition records did not account for the disposition of firearms it
actually sold. (USA04095)  Trader did not provide the semi-annual print-out of its electronic
acquisition and disposition records. (USA04096)  Trader failed to report multiple handgun
sales no later than the close of the following business day, using ATF Form 3310.4, as
required by submission to the ATF and local law enforcement. (USA04097)

b.      2002 Inspection

From July 15, 2002 to approximately August 23, 2002, ATF inspected Trader
Sports.  Declaration of Ronald Borg; Declaration of Jun Tucay; Declaration of Frances Irving.
The inspection revealed violations of regulations governing federal firearms licensees.
(USA04099-100)  Again, Trader's acquisition and disposition records did not account for the
disposition of firearms it actually sold. (USA04100)  Again, Trader did not provide the semi-
annual print-out of its electronic acquisition and disposition records. (USA04099)  Again,
Trader failed to report multiple handgun sales no later than the close of the following business
day, using ATF Form 3310.4, as required by submission to the ATF and local law
enforcement. (USA04100)  At Trader's request, a meeting to discuss the inspection results
was postponed by several weeks until September 27, 2002. Borg Declaration, ¶ 3.

c.      2003 Inspection

On September 2, 2003, ATF inspectors documented an inventory of 3,659
firearms on Trader's premises. (USA05059)  On the same date, Trader's records showed an
inventory of 9,100 firearms. (USA05053:5-16)  In an effort to reconcile this difference,
inspectors and Trader's staff cross-checked entries in Trader's unofficial written record
books. (USA05058:3-15)   But this showed that an additional 2,000 firearms recorded as
received in the unofficial records could not be accounted for. Id.  As a result, a total of 7,477
firearms were shown as received by Trader were not in its inventory and/or could not be

accounted for in its disposition records.[4] (USA05062)  Trader later filed reports in November 2003 confirming it lost 2,897 firearms. (USA05069)   Subsequent reconciliation efforts by Trader reduced its missing firearm count to 1,723 firearms. (USA00039)  This was a repeat violation from the 2000 and 2002 inspections. (USA05067-69)

In September 2003, ATF inspectors determined that Trader failed to obtain proper documentation before transferring semi-automatic assault weapons with large capacity ammunition feeding devices in 22 incidences and before transferring weapons with large capacity ammunition feeding devices to law enforcement officers in 110 incidents. (USA01543-1634; 05069-05077; 05388)  Before transfer of these firearms, the licensee is required to obtain certain information from the purchaser, under penalty of perjury, and a certification from a supervisor in the law enforcement agency on agency letterhead, in order to ensure the weapons are for official law enforcement use only. (USA05069-77)

ATF inspectors also found 431 instances where the licensee did not properly complete and maintain firearm transaction records. (USA05078-79, 5090-91)  Federal firearms licensees must complete ATF Form 4473, including verifying the purchaser's identity and other pertinent information and recording contact with a national database regarding the buyer's criminal background. (USA01439-40, 1496)  On more than 200 such forms between August 2002 and August 2003, the licensee failed to verify the purchaser's address entry on the form with the identification document presented by the transferee. (USA02872-3673, 5079-80)  On 32 transactions, Trader failed to document that legal alien transferees met the 90 day requirement for state residency. (USA05082-86)  In additional instances, the licensee failed to obtain information from transferees in response to required information fields, failed to halt transactions because of missing responses to section 12 of the form 4473 seeking to know if the intended recipient of the weapon was a fugitive from justice, and permitted a transaction to be completed even though a transferee indicated in response to section 12 that he was under indictment or information for a felony or other crime for which a judge could impose a

---

[4]In addition, the inspection determined that Trader had 141 firearms in its possession that it had not accounted for in its acquisition records. (USA05245:4-7)

sentence of more than one year. (USA05082-90)

ATF determined that in September 2002, Trader failed to re-initiate a criminal background check for transferee Evans. (USA05093-93)  After thirty days, a request for background check lapses under the law. (USA01522, 1433)

ATF inspectors documented that Trader did not maintain 5,111 transaction records, form 4473, in alphabetical, chronological or numerical order. (USA05096-97)  The licensee organized these records alphabetically by month. Id.

ATF inspectors found that in 18 multiple handgun sales involving 39 firearms, Trader failed to submit ATF form 3310.4. (USA05098-100)  Regulations require that this form be submitted to ATF and local law enforcement no later than the close of business of the day of the multiple sale. (USA01443-44)  This was a repeat violation from the 2000 and 2002 inspections. (USA05100-01, 4097, 4100)

ATF determined that Trader failed to respond accurately or within 24 hours of receipt of a request from the National Tracing Center for information in Trader's records, for the purpose of determining disposition of certain firearms. (USA05103-05)  For example, Trader received trace requests for two firearms involved in crimes. Id.  On September 27, 2002, Trader received a trace request for a Mossberg 12 gauge shotgun, to which Trader responded that it had no record of receipt or disposition for the shotgun. (USA05103, 5382) Police found the shotgun in possession of an accused heroin dealer in August 2002. (USA05836, 5838-39, 5842)  Using Trader's own records, ATF found that Trader acquired the shotgun on April 25, 2002. Id.  Likewise, on May 3, 2004, Trader received a trace request for a Bryco 9 mm caliber pistol. (USA05104)  Trader reported that the pistol was still in inventory. (USA05399)  Police found the pistol in the possession of a 14 year old junior high school student, while on school grounds during school hours. (USA05309)  Again, using Trader's own records, ATF found that Trader acquired the pistol on February 23, 1996. (USA05102-05)

4.    Procedural History

On July 29, 2004, ATF issued a Notice of Revocation of License to Trader. (USA0001) On  August 9, 2004, the licensee timely requested a hearing. (USA00084)  On September 9,

2004, the licensee requested a continuance of the hearing. (USA00093)  Before the hearing, the licensee requested that the hearing officer issue subpoenas.  ATF informed Trader that the Federal firearms statute did not provide for compulsory process. (USA00104-5)  Trader's attorney presented three procedural motions at the outset of the hearing, to which the hearing officer reserved ruling. (USA05400-08, 5010-24)  The hearing took place on November 16-17, 2004 in Dublin, California.  The government presented live testimony from witnesses Amy Olszewski, Jun Tucay, and Dennis Anderson, as well as numerous exhibits.(USA5005-5366; Exhibits GX-1 through GX-23; Appendices A through F and Appendix R)  The licensee did not present any live witness testimony but did offer numerous exhibits.

At the close of the hearing, the parties agreed that the licensee's attorney would be allowed to submit a post-hearing letter brief to which the government could respond. (USA05362-5365)  Trader's attorney submitted a letter brief on November 23, 2004. (USA05958-66) The government submitted a brief and supporting evidence, in response, on November 24, 2004. (USA00176-192)

On December 23, 2005, Director of Industry Operations Mary Lerch, who has since retired, issued the Final Notice of Revocation of License to Trader, setting the effective date of the revocation as June 1, 2006. (USA00078-79)  On February 22, 2006, Trader requested that the effective date of the revocation be stayed until the final adjudication of this complaint. Segal Declaration, Exh.s H, I. ATF refused this request due to the magnitude of the violations by Trader. Declaration of Martina J. McKee ¶ 65.

## ARGUMENT

**A.  STANDARDS APPLICABLE TO PRELIMINARY INJUNCTIVE RELIEF UNDER FRCP 65 AND STAY REQUESTS FOR FEDERAL FIREARMS LICENSE REVOCATIONS.**

In the Ninth Circuit, the party seeking a preliminary injunction must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. Dr. Seuss Enters. v. Penguin Books USA, Inc., 109 F.3d 1394, 1397, n. 1 (9th Cir.1997). These standards "are not separate tests but the outer reaches of a single continuum." International Jensen, Inc. v. Metrosound U.S.A., 4 F.3d 819, 822 (9th Cir.1993) (citation omitted).  The

continuum concept means that if the district court is less certain of the likelihood of success on the merits, " the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Southwest Voter Registration Ed. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003). In each case, the court " must balance the competing claims of injury and must consider the effect on each part of the granting or withholding of the requested relief" while giving the public interest in the proceeding " particular regard." Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531 (1987). Finally, there is authority for the proposition that a court need not balance hardships when the misconduct has been willful, such as repeated violations of environmental laws and regulations. United States v. Marine Shale Processors, 81 F.3d 1329, 1359 (5th Cir. 1996).

**B. TRADER SPORTS HAS NOT RAISED SUFFICIENTLY SERIOUS QUESTIONS AS TO THE MERITS AND DOES NOT HAVE A LIKELIHOOD OF PREVAILING ON THE MERITS.**

Under any formulation, to obtain a preliminary injunction, Trader Sports must show that it is likely to prevail on its claims. A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1015, n. 3 (9th Cir. 2001). The motion should be denied because it is likely that the ATF will prevail on the merits. At the hearing, the ATF presented voluminous evidence of repeated, systemic recordkeeping violations by Trader Sports. This is not in serious dispute, but rather Trader argues that the violations were not willful. Given the well-documented history of this licensee, with repeated written acknowledgments by its president of the governing regulations, Trader blatantly disregarded the regulations. To shift the focus away from its abysmal recordkeeping practices, Trader argues unpersuasively that the inspection and hearing process violated Fourth and Fifth Amendment rights. Trader has not raised sufficiently serious questions about the merits to justify the injunctive relief requested.

**1.    TRADER SPORTS WILLFULLY VIOLATED STATUTES AND REGULATIONS GOVERNING FEDERAL FIREARMS LICENSEES.**

When a Federal firearms licensee has knowledge of the obligations imposed by Congress and either disregards or is indifferent to these obligations, such conduct willfully violates the regulatory scheme created by Congress. Cucchiara v. Secretary of Treasury, 652 F.2d 28, 30 (9th Cir. 1981), cert. denied, 455 U.S. 948 (1981); Steins, Inc. v. Blumenthal, 649 F.2d 463 (7th Cir.

1980); <u>Prino v. Simon</u>, 606 F.2d 449 (4th Cir. 1979); <u>Lewin v. Blumenthal</u>, 590 F.2d 268 (8th Cir. 1979).

Trader Sports knew its obligations under this regulatory scheme. In 1983, Trader's president acknowledged that he would "fully comply with all recordkeeping requirements imposed by law and regulation..." (USA00196) In 2000, when it received the report of violations found in ATF's inspection, Trader's president signed an acknowledgment of the violations. (USA04092-98, 0166) In 2002, again, Trader's president signed an acknowledgment of violations set forth in the ATF's inspection report. (USA04099-4100, 4118)

      a.     <u>Computer recordkeeping</u>: On March 5, 1999, Trader received its requested variance to the computer recordkeeping requirement, subject to regulations and approved agency procedures set forth in writing, including in the <u>Federal Firearms Regulations Reference Guide</u>. (USA04105-06) On July 27, 2000 and September 27, 2002, Trader received a Report of Violations regarding the computerized recordkeeping requirement, each of which Trader's President signed. (USA04092-4100) On November 19, 2002, ATF sent a warning letter to the licensee regarding this same violation. (USA04101-03) The revocation was based on Trader Sports failure to adhere to the terms of its variance and the significant discrepancy between the computer record of inventory and the physical count of weapons. See, e.g., Appendices A, B, and C at USA00201-1542 & testimony at USA05044-54.

      b.     <u>Unaccounted for inventory</u>: Again, the 2000 and 2002 inspections each led to a Report of Violations, signed by Trader's President. (USA04092-100, 4118) <u>See also</u> <u>Cucchiara v. Secretary of Treasury</u>, 652 F.2d 28, 29 (9th Cir. 1981) (repeated failure "to record the acquisition and disposition of firearms and a loss without reasonable explanation of 200 firearms"). There was extensive evidence of Trader's unaccounted for inventory. See, e.g., Appendices A, B, and C at USA00201-1542 & testimony at USA05042:15-5068:16.

      c.     <u>Failure to document sales of semi-automatic and similar weapons</u>: ATF sent an open letter to all California licensees explaining it would be a violation of Federal law to release an assault weapon or large capacity ammunition feeding device without the required information and documentation. "Implementation of Public Law 103-322, the Violent Crime Control and Law Enforcement Act of 1994," reprinted at 63 Fed. Reg. 12643

(3/16/98).  The <u>Federal Firearms Regulations Reference Guide</u> also describes these regulatory requirements. (USA01445) Trader Sports did not document and maintain the required information. (USA05070-78)

      d.     <u>Failure to maintain and verify complete & accurate Form 4473s</u>:

On July 27, 2000 and September 27, 2002, Trader received a Report of Violations regarding the requirements pertaining to form 4473, each of which Trader's President signed. (USA04092-4100)  The ATF publication <u>Federal Firearms Regulations Reference Guide</u> also describes these requirements at USA01439-42.  The revocation was based on extensive evidence of Trader's failure to document, verify and maintain accurate Form 4473s.  See, e.g., Appendix E at USA01635-4035 & testimony at USA05070-106.

      e.     <u>Failure to make (or re-initiate) proper checks on criminal background</u>:

On July 27, 2000 and September 27, 2002, Trader received a Report of Violations regarding the requirements pertaining to criminal background checks, each of which Trader's President signed. (USA04092-4100)  In addition, California officials sent Trader a letter dated June 14, 1999 warning that ten firearms had been unlawfully transferred due to lapsed background checks. USA04135-36; see also <u>Federal Firearms Regulations Reference Guide</u> at USA01433.  Trader Sports failed to follow these requirements, too.  See, e.g., testimony at USA05086-88.

      f.     <u>Failure to submit documentation of multiple sales to law enforcement</u>:

The licensee received the ATF's FFL Newsletter for April 2001 which explained that ATF form 3310.4 was to be completed by the dealer when the firearms were actually delivered to the purchaser. (USA04082)  In addition, in Reports of Violations dated July 27, 2000 and September 27, 2002, ATF cited Trader for this violation, and Trader's President acknowledged the notice by countersignature. (USA04092-4100)  Finally, in <u>Cucchiara v. Secretary of Treasury</u>, 652 F.2d 28, 29 (9th Cir. 1981) the Ninth Circuit noted that Trader's President conceded he had "unreported multiple handgun sales."  ATF found that Trader Sports failed to complete and submit the required documents of multiple sales, accounting for 18 transactions involving 39 weapons.  See, e.g., testimony at 5098:6-5101:14.

      g.     <u>Failure to respond to National Tracing Center request within 24 hours</u>:

This requirement is well known to licensees and has been published in the ATF's <u>Federal</u>

Firearms Regulations Reference Guide, page 140, question F19. (USA01512)

A major purpose of the firearms regulations, as declared by Congress, was to control interstate and foreign commerce in weapons in order to combat crime. Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901, 82 Stat. 226, reprinted following, 18 U.S.C. § 921. Entries on required records maintained by licensed dealers are "designed to keep a constant record of the transfer and location of firearms in order to reduce the indiscriminate flow of ... weapons and the crime that inevitably follows in their wake." United States v. Scherer, 523 F.2d 371, 374 (7th Cir. 1975), cert. denied, 424 U.S. 911 (1976). "Without such a record, the ease with which arms could be anonymously acquired would subvert the purpose of the legislation. See S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted 1968 U.S. Code Cong. & Admin. News 2112, 2113-14. ATF found instances where Trader Sports did not respond to the Tracing Center in a timely manner under the law. See, e.g., testimony at 5101-105.

A violation is "willful" if a firearms dealer "understands the requirements of the law, but knowingly fails to follow them or was indifferent to them. Perri v. Department of Treasury, 637 F.2d 1332, 1336 (9th Cir. 1981). Here, Trader understood the requirements of the laws and yet still did not follow them. It now says its violations in 2003 should be excused as simple inadvertence or the human error. This is a hollow excuse. Judge Conti's 1979 Order and Judge Lynch's 1983 Order put Trader Sports on notice of the vital importance of meticulous recordkeeping in the policy objectives balanced by Congress in creating a licensing scheme for firearms dealers. RJN at USA06039 & USA06136. In 1983, Trader Sports' principal owner promised to "fully comply" with all firearms laws and regulations, as a specific condition of his license. (USA00196 at ¶11) In 2000, Trader Sports' principal acknowledged notice of multiple violations of firearms regulations by signing in seven locations a report from ATF on June 27, 2000. (USA04092-98) In 2002, Trader Sports' principal again acknowledged notice of multiple violations of firearms regulations by signing a report from ATF on September 27, 2002. (USA04100). By letter dated November 19, 2002, ATF drew Trader Sports' attention to five categories of repeated violations and stated, in part:

> ...[Y]ou are reminded that Federal laws and regulations which govern the firearms industry are specific. Your continued operation under your license is contingent upon compliance with

all applicable laws and regulations...This letter serves as a warning to you that these violations are now part of your record and will be considered, should there be other violations in the future, for possible adverse action against your license to operate. (USA04102)

Courts have found willfulness on much less evidence than is present here. See, e.g., Appalachian Resources Development Corporation v. McCabe, 387 F.3d 461, 464-65 (6th Cir. 2004) (continued violations after notice is willful violation – collecting cases); Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco & Firearms, 415 F.3d 1274, 1310 (11th Cir. 2005) (as a matter of law, finding of willfulness by courts has been "routine" when licensee engages in repeated violations after being previously advised by ATF); Perri v. Department of Treasury, 637 F.2d 1332, 1336 (9th Cir. 1981)(wilfulness "established when a dealer understands the requirements of the law, but knowingly fails to follow them or was indifferent to them").  A licensee with this kind of history should not escape responsibility by claiming inadvertence.  "Surely, Congress could not have intended to allow such easy evasion of a comprehensive scheme."  United States v. White, 451 F.2d 696, 699 (5th Cir. 1979).  Instead, if ever there was a regulatory scheme that required the licensee to "sweat the details" this is the one. See Willingham Sports, Inc. v. BATF, 415 F.3d 1274, 1309 fn. 14 (11th Cir. 2005) and 16 other cases cited in Appendix of Authorities.

## 2. THE ADMINISTRATIVE ACTION RESULTING IN TRADER SPORT' S LICENSE REVOCATION WAS NOT THE PRODUCT OF AN UNCONSTITUTIONAL OR UNLAWFUL INSPECTION.

Trader claims that the ATF violated 18 U.S.C. § 923(g)(1)(B)(ii) because it inspected its inventory and records twice within a twelve month period.  The statute states that " [t]he Attorney General may inspect or reexamine the inventory and records of a licensed…dealer" without a warrant not more than once in any 12 month period.  The remedy Trader seeks is suppression of all evidence of its recordkeeping violations adduced at the hearing.  The inspections did not violate Congress'  directive against more than one inspection in a year and there is no authority for suppression.

The exclusionary rule is a judicially created remedy designed to safeguard Fourth Amendment rights in criminal proceedings by deterring future unlawful police conduct.  United States v. Calandra, 414 U.S. 338, 347 (1974); NLRB v. South Bay Daily Breeze, 415 F.2d 360 (9th Cir. 1969), cert. denied, 397 U.S. 915 (1970); United States v. Janis, 428 U.S. 433 (1976);

Midwest Growers Cooperative Corp. v. Kirkemo, 533 F.2d 455, 466 (9th Cir. 1976).

The Supreme Court has refused to expand the applicability of the exclusionary rule beyond criminal trials. INS v. Lopez-Mendoza, 468 U.S. 1032 (1984) (exclusionary rule not applicable to civil deportation proceeding); United States v. Calandra, 414 U.S. 338 (1974) (exclusionary rule not applicable to Federal grand jury proceeding); but see Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965) (exclusionary rule applied to civil forfeiture proceeding where forfeiture was penalty for criminal offense).  The Ninth Circuit has followed Lopez-Mendoza and held that the exclusionary rule does not apply to civil and administrative proceedings. Benitez-Mendez v. INS, 760 F.2d 907 (9th Cir. 1985)(deportation hearing); Garrett v. Lehman, 751 F.2d 997 (9th Cir. 1985)(military administrative proceeding).[5]  Firearms dealing is a highly regulated industry and that a businessman in such an industry, in accepting the burdens as well as the benefits of the trade, is said to consent to restrictions placed upon him. Marshall v. Barlow's, 436 U.S. 307, 313 (1978).  The exclusionary rule has been held to be inapplicable to high regulated industries. United States v. Blue Diamond Coal Co., 667 F.2d 510, 520 (6th Cir. Ky. 1981) (public interest in mining company records negated asserted 4th Amendment interest).

The undisputed facts do not support Trader's claim.  The 2002 inspection began on July 15, 2002 with a sampling of the firearms inventory, which was completed on July 19, 2002.  Declarations of Ronald Borg, Jun Tucay, and Frances Irving.  Next, the inspectors verified the inventory sample with the computerized Acquisition and Disposition records and the Firearms Transaction Records (ATF Form 4473) and other required records on the licensed premises until August 23, 2002. Id.  The inspectors left the dealer's business on that day with their field work papers to finish their post-inspection work-up and prepare the final report and after August 23, 2002 ATF did not physically inspect Trader's inventory or records until September 2003. Id.  At Trader's request, the ATF agreed to postpone a meeting to discuss the inspection results until September 27, 2002, a postponement of thirty days, so that one of Trader's employees could be present, as an accommodation of Trader's scheduling request. Borg Declaration ¶ 2.  The

---

[5]However, in Orhorhaghe v. INS, 38 F.3d 488, 493 (9th Cir. 1994) the Ninth Circuit stated that in connection with deportation hearings the exclusionary rule could apply if evidence was "obtained through an egregious violation of the Fourth Amendment."

meeting occurred on September 27, 2002.  There was no inspection of Trader's records or inventory on the day of the conference. Borg ¶ 3; Tucay ¶ 3; Irving ¶ 3.  Thereafter, on September 2, 2003, ATF inspected Trader's records.  The basis for ATF's decision to revoke Trader's license included numerous, repeated violations of the Federal firearm regulations found in the 2000, 2002 and 2003 inspections.

The September 27, 2002 conference was a meeting to discuss violations found during July and August, not an inspection of records or inventory.  Trader Sports requested the scheduling of the conference, and in order to accommodate Trader's employee's availability, the ATF agreed to the delay.  An accommodation of a scheduling request is not a search and seizure. These facts do not support suppression of any inspection evidence.

Even if the September 27, 2002 meeting could somehow be deemed an inspection, as a matter of law, the exclusionary rule should not apply here.  First, under Ninth Circuit precedent, the exclusionary rule is an extreme sanction applicable in criminal proceedings only.  There is no criminal proceeding here, so the exclusionary rule does not apply.

Second, Trader requested that ATF be present at Trader's premises on that date. Traders consent was freely and voluntarily given.  United States v. Chan-Jimenez, 125 F.3d 1324, 1327 (9th Cir. 1997). Therefore, due to Trader's consent, the exclusionary rule does not apply.

Third, even if the Court determined that the September 27th conference was an inspection and the ATF violated the once in 12 month rule there is no case holding that inspection evidence should be suppressed.  Given that the ATF merely accommodated Trader in the scheduling of the September 27th conference, the balance of interests under the Fourth Amendment favors the government's position.

### 3.   THE INFORMAL HEARING PROCESS DID NOT VIOLATE THE DUE PROCESS OR EQUAL PROTECTION CLAUSES

Informal firearms license hearings are governed by 18 U.S.C. § 923 and 27 C.F.R. Subpart E of Part 478.  After a licensee requests a hearing following a notice of revocation, the Division's Director of Industry Operations requests assignment of a hearing officer, which assignment is made by the Program Manager for Firearms and Explosives Services in Atlanta, Georgia. Hearing officers are trained AFT inspectors, not lawyers or administrative law judges.

Informal hearing procedures at the administrative hearing level do not violate due process or equal protection, and this argument has been rejected by at least one court in a firearms license revocation case. 3 Bridges, Inc. v. United States, 216 F.Supp.2d 655, 659-660 (E.D.Ky. 2002) (normal rules of evidence do not apply in firearms administrative proceeding).

- Lack of subpoena/compulsory process/cross-examination:

"Subpoena power is not an intrinsic feature of the administrative process, and courts cannot engraft subpoena authority onto an agency's charter from Congress." Johnson v. United States, 628 F.2d 187, 193 (D.C. Cir. 1980).  In this case, neither side had the power to compel the attendance of witnesses whose testimony the other side offered by declaration.  Mr. Cucchiara submitted a declaration and there was no opportunity to cross-examine him.  The government faced the same constraints when it came to testimony offered by Trader by way of declaration.

- Rules of Evidence/Objections/Hearsay:

Rule 1 of the Federal Rules of Civil Procedure clearly states that "These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty, with the exceptions stated in Rule 81."  Fed. R. Civ. P. 1; see also McMorrow v. Schweiker, 561 F. Supp. 584, 586 (D.N.J. 1982) (Federal Rules of Evidence are not applicable to proceedings before administrative agencies); Mister Discount Stockbrokers, Inc. v. S.E.C., 768 F.2d 875, 878 (7th Cir. 1985) ("neither the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure apply to administrative hearings.") An agency determination may rest on hearsay evidence. Richardson v. Perales, 402 U.S. 389 (1971) (hearsay evidence may constitute "substantial evidence"[6] for purposes of reviewing agency action).  See Calhoun v. Bailar, 626 F.2d 145, 148 (9th Cir. 1980), cert. denied, 452 U.S. 906 (1981); Sears v. Department of the Navy, 680 F.2d 863, 866 (1st Cir. 1982).[7]

---

[6]However, section 923 employs the preponderance of the evidence standard, which is the same even when the sanction results in loss of occupation.  See Benjamin v. Bureau of Alcohol, Tobacco, & Firearms, 1993 U.S. App. LEXIS 19504 (9th Cir. July 26, 1993), citing, Steadman v. SEC, 450 U.S. 91, 98 - 102 (1981); Lopez v. United States, 129 F. Supp. 2d 1284, 1288 (D.N.M. 2000).

[7]In fact, under Ninth Circuit precedent, courts considering applications for preliminary injunctions such as this case may consider inadmissible evidence. Flynt Distrib. Co. v. Harvey,

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
C 06-1136 VRW                    -19-

1

2

3

Similarly, courts have rejected arguments, such as that by Trader, that an administrative hearing violated constitutional rights because, as here, the hearing officer only noted objections in the record.  Swinton v. Potomac, 270 F.3d 794, 809 (9th Cir. 2001) (told counsel to continue with the witness, exhibits were not excluded).

4

- Prejudgment by ATF:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Trader Sports argues, without evidence, that apart from the process involved the ATF decisionmaker, Ms. Lerch, prejudged the inspection and investigation into Trader Sports, pointing to a pre-prepared letter rescinding a record keeping variance for its acquisition and disposition bound book records.  Trader ascribes an improper motive and bias to Ms. Lerch, without evidence.  "Where administrative matters are concerned we must proceed on the assumption that the administrators are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven."  Hortonville Joint School District No. 1 v. Hortonville Education Assn., 426 U.S. 482, 497 (1976).  Trader Sports received the variance in 1999, which itself stated the variance "may be rescinded if it is determined that the effective administration of firearms laws and regulations are hindered in any manner." (USA04106)  In 2000, it received a notice of violation for failure to prepare the computer printout required.  In 2002, it violated the same provision.  ATF sent Trader a letter in November 2002 warning it that continued violation could result in the rescission of the variance: "If you cannot provide ATF with [computer record] in the future, we will rescind your approval to use computerized records." (USA04102) Considering this ongoing course of Trader Sports failing to comply with the variance, for which it had received notices of violations on two occasions, it was reasonable for ATF to anticipate that Trader might well continue in this vein and prepare the letter. Declaration of Martina J. McKee ¶ 64.  Having a letter to rescind the variance, for use contingent on further noncompliance by Trader Sports, does not violate due process.

25

- Unfair targeting by ATF:

26

Trader claims ATF singled it out for unfair targeting in the 2003 inspections.  Given the

27

28

734 F.2d 1389, 1394 (9th Cir. 1984).

number of warnings to Trader that it must comply with the laws, including a specific warning letter in 2002 describing intolerable repeated violations, ATF would have been derelict in its duty if it had not conducted a further inspections.  By doing so, ATF could verify whether Trader had, at long last, taken the steps it promised to in 2002, 2000 and earlier to comply fully with the laws governing firearms licensees.  When ATF inspected Trader Sports in 2003, it did so efficiently, with an eye toward managing its workload, allocating its resources appropriately and minimizing disruption to Trader's ongoing business.  Declaration of Martina J. McKee ¶63.  Finally, there is no due process right embedded in the settlement agreement cited by Trader Sports, although it does contain Trader's promise to "fully comply with all recordkeeping requirements imposed by law and regulation..."  (USA00196 at ¶11) ATF had every right to expect Trader Sports to abide by that promise and the regulatory scheme imposed by Congress.

In summary, the administrative hearing did not violate due process.  Trader Sports had the opportunity to call witnesses and introduce evidence.  It was represented by counsel and made objections on the record.  The hearing officer, agency counsel and the ATF decision maker functioned independently in different roles prescribed by agency regulations.  After the hearing, the licensee exercised its right to de novo review in the district court, as provided by statute.  This scheme satisfies the due process and equal protection clauses.

## C. TRADER SPORTS HAS FAILED TO SHOW ANY IRREPARABLE INJURY OR THAT THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN ITS FAVOR.

### 1. THERE IS NO IRREPARABLE INJURY BECAUSE ALL CLAIMED HARM IS COMPENSATORY AND THE SO-CALLED INJURIES ARE SELF-INFLICTED.

There is no irreparable injury in this case, because all of the harm claimed is measurable and economic.  The motion describes " financial damage" such as loss of employment for employees, loss of customers and goodwill, loss of inventory value, loss of business profitability and the like.  These are injuries compensable by monetary damages.  The existence of a compensatory damages weighs heavily against a claim of " irreparable" harm. Sampson v. Murray, 415 U.S. 61, 90 (1974); Los Angeles Memorial Coliseum Comm' n v. NFL, 634 F.2d 1197, 1202 (9th Cir. 1980) (lost revenues, diminution in property value and loss of goodwill are all monetary damages that can be remedied at law).  Loss of property or

customers may be sufficient to show irreparable injury in another setting, but not here. Sundance Land v. Community First Federal Savings & Loan, 840 F.2d 653, 661 (9th Cir. 1988) (mortgage purchaser showed foreclosure would be due to predecessor-in-interest's conduct); Stuhlberg Int'l Sales Co., Inc. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) (party in trademark dispute showed detention of goods by customs officials would endanger new, large customer relationships). Destruction of a business may be irreparable if based on a unique contract right, if damages would be difficult to quantify. Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186 (2d Cir. 1995) (preliminary injunction proper when franchise wrongfully terminated). Damage to reputation may also be irreparable, but not if compensatory damages are adequate. Cassim v. Bowen, 824 F.2d 791 (9th Cir. 1987).

In addition, there is no "irreparable" injury here because the alleged harm is the direct result of Trader's continued, systemic lack of compliance with firearms regulations or its business decisions over the past six months, both of which are self-inflicted injuries. Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3rd Cir. 1995); Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1080, 1106 (10th Cir. 2003).

### 2. THE BALANCE OF HARDSHIPS SUPPORTS THE REVOCATION BECAUSE OF THE PUBLIC SAFETY IMPLICATIONS FROM TRADER SPORTS' BLATANT DISREGARD FOR FEDERAL FIREARMS REGULATIONS.

Before a preliminary injunction may issue, the court must identify the harm that a preliminary injunction might cause the defendant and weigh it against the plaintiff's threatened injury. Scotts Co. v. United Industries Corp., 315 F.3d 264, 284 (4th Cir. 2002). In addition, where the public interest is involved, the court must determine whether the public interest favors the moving party and failure to do so on the record is an abuse of discretion. Sammartano v. First Judicial Dist. Ct., in & for County of Carson City, 303 F.3d 959, 974 (9th Cir. 2002); United States v. Oakland Cannabis Buyers' Coop., 190 F.3d 1109, 1114 (9th Cir. 1999). Congress weighed this hardship carefully in creating the law.

The public interest in this case is significant. A chief policy objective of the 1968 Act and the regulatory scheme, according to the Supreme Court, is to "keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." Barrett v. United

States, 423 U.S. 212, 218 (1976).  By adhering to recordkeeping requirements, a federal firearms licensee can account for the firearms it has been granted the privilege to sell under certain conditions.  This promotes safety of the public and the ability of law enforcement, through trace requests, to investigate a firearm's transactional history, which aids the investigation of crime.  If criminal investigation is more effective, successful prosecutions are more likely, thus reducing crime by creating a deterrent effect.  The role of the Federal firearm licensee as the historian of firearms and firearms transactions is to promote these vital public interests through adherence to the statutory scheme.  "If ever there were a statutory scheme where a licensee should be obligated to 'sweat the details,' irrespective of how trifling they appear, the Gun Control Act would appear to fit that bill."  Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, 348 F.Supp.2d 1299, 1309 n. 14 (S.D. Ala. 2004); see also 3 Bridges, Inc. v. United States, 216 F.Supp.2d 655, 659 (E.D.Ky. 2002) (Lack of compliance with recordkeeping requirements hinders the policy objectives of the Act).

Measured by trace requests, Trader Sports is the second largest licensee in the nation, out of more than 100,000 licensees.  In calendar year 2005, Trader Sports had the second highest number of requests by law enforcement to trace firearms in the country.[8]  Declaration of Sania Franken, Exh. A; Johnson Declaration¶ 2-7.  Over the past three calendar years, when compared to the next two largest retail dealers in California (non-chain, single location), Trader Sports had a much higher proportion of firearms recovered by law enforcement in relation to firearms sold.  For each of the years, Trader had trace requests amounting to approximately 12% of its sales figures, a much higher rate than the other two retailers. Declaration of Sania Franken, Exh. B.  By its size and the scope of its operations, Trader Sports, therefore, has a significant impact on the public interest by the manner in which it conducts its firearms sales.

---

[8]An unsuccessful "trace request" occurs when the dealer cannot account for the acquisition or disposition of the firearm, thus thwarting law enforcement efforts to investigate the history of the traced weapon.  In the past three years, Trader Sports had 19 unsuccessful traces, even after having extra time to track the weapon beyond the 24 hours required by law. Declaration of Amy Johnson ¶5.  By comparison, the largest retail location in California, a chain store in San Bernardino, had only 1 unsuccessful trace during that period. Id. ¶4.

Moreover, even to this day, Trader Sports sells a significant number of firearms that are recovered by law enforcement a short time later.  In the motion, Trader Sports touted changes it made to its computerized recordkeeping system after investing thousands of dollars following the 2003 inspection.  These efforts have not proven effective.  In 2003, 2004 and 2005, Trader Sports sold 7, 13, and 12 firearms that were recovered by law enforcement <u>within three months</u>, respectively. Franken Declaration, Exh. C.  The figures for recovery in slightly longer time periods, such as 3-12 months, 1-2 years and 2-3 years are similarly shocking.  Trader Sports sells firearms that end up at crime scenes, and it knows this because it receives the trace requests, which is all the more reason its violations of the regulations are willful.

Moreover, these firearms, and the other weapons sold by Trader that have been the subject of trace requests from law enforcement over the past three years – since the efforts to come into compliance touted by Trader – are being recovered by law enforcement in the Bay Area communities with the highest crime rates. Franken Declaration, Exh. D.  In 2003, there were **252** firearms sold by Trader Sports recovered by law enforcement in the Bay Area.  Id. at Exh. D-3.  In 2004, this number was higher – **290**.  Id., Ex. D-2.  In 2005, **279** firearms sold by Trader were recovered by law enforcement in the Bay Area. Id., Ex. D-3.  The maps prepared by ATF show that the steady stream of recoveries of these firearms by law enforcement is happening primarily in areas typically associated as having high crime rates, at a rate of nearly one per day.  The public interest weighs heavily in favor of keeping firearms out of the hands of those persons who would do harm with them, and again Trader Sports knows of its impact on public safety because it receives the trace requests, which again highlights why Trader Sports and all other dealers should " sweat the details" in keeping records of firearm acquisition and disposition.

Finally, when a trace request is unsuccessful, the dealer cannot account for the acquisition or disposition of the firearm, thus thwarting law enforcement efforts to investigate the history of the traced weapon.  In the past three years, Trader Sports had 19 unsuccessful traces, even after having extra time to track the weapon beyond the 24 hours required by law.  Declaration of Amy Johnson ¶5.  By comparison, the largest retail location in California, a chain store in San Bernardino, had only 1 unsuccessful trace during that period. Id. ¶4.  The number of

unsuccessful traces for Trader Sports, during the past three years after changes to their recordkeeping, poses a significant risk to the policy objectives Congress had in mind.  See Declaration of Amy Johnson at ¶ 4-5.  The public interest favors revoking this license.

### D.  THE INTERESTS OF JUSTICE DO NOT SUPPORT A STAY OF REVOCATION.

Trader Sports moves for an order staying the effective date of its license revocation.[9]  First, it should be noted that Trader made this same argument before Judge Conti in 1979, seeking a stay while the matter was on appeal.  Declaration of Jonathan U. Lee, Exh. A.  Judge Conti denied the request, noting Trader's " long history of gross disregard of or indifference to legal requirements and the gravity of harm to the public that flows from failure to comply with those requirements…" Id. at p. 4.

Similarly, in this action, a well-developed record of evidence shows that in 2000, 2002 and 2003 ATF inspectors found multiple, systemic violations of pertinent regulations in Trader Sports.  This despite clear evidence of notice to and acknowledgment by Traders to follow the laws.  ATF decision makers decided not to grant the requested stay because of these violations and the harm they posed to the public safety.  Declaration of Martina J. McKee ¶ 65.  If the stay is granted pending disposition of this suit, Trader Sports will effectively be permitted to operate with continued disregard for its obligations under law.  If a decision to revoke a license in this circumstance, on this record, does not justify denial of a stay, the regulatory scheme will be rendered powerless to stop rogue licensees.

### CONCLUSION

The motion and request for stay should be denied in the interests of justice.

DATED: May __, 2006                    Respectfully submitted,

                                       KEVIN V. RYAN
                                       United States Attorney

                                       /Jonathan U. Lee/

                                       JONATHAN U. LEE
                                       Assistant United States Attorney

---

[9]The requested stay is discretionary.  See Judge Nickerson's March 15, 2006 Order (Exh. B to Corrected Declaration of Jonathan U. Lee) citing regulation as discretionary.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
C 06-1136 VRW                                   -26-