1   MALCOLM S. SEGAL - SBN 075481
    JAMES P. MAYO - SBN 169897
2   SEGAL & KIRBY
    770 L Street, Suite 1440
3   Sacramento, CA 95814
    Telephone: (916) 441-0828
4
    Attorneys for Plaintiff/Petitioner
5   TRADER SPORTS, INC. dba
    THE TRADERS
6

7

8           IN THE UNITED STATES DISTRICT COURT FOR THE

9               NORTHERN DISTRICT OF CALIFORNIA

10

11  TRADER SPORTS, INC. dba          CASE NO. C 06-01136 VRW
    THE TRADERS
12                                   PLAINTIFF/PETITIONER'S
              Plaintiff/Petitioner,  MEMORANDUM OF POINTS AND
13                                   AUTHORITIES IN SUPPORT OF
        vs.                          MOTION FOR PARTIAL SUMMARY
14                                   JUDGMENT
    ALBERTO GONZALES, Attorney
15  General, United States Department of   Date:      October 5, 2006
    Justice, CARL J. TRUSCOTT, Director,   Time:      2:00 p.m.
16  Bureau of Alcohol, Tobacco, Firearms   Dept:      6
    and Explosives, United States          Judge:     Hon. Vaughn R. Walker
17  Department of Justice, MARY LERCH,
    Director of Industry Operations, San
18  Francisco Field Division, Bureau of
    Alcohol, Tobacco, Firearms and
19  Explosives, United States Department
    of Justice,
20
              Defendants/Respondents.
21  _____/

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The ATF's Warrantless Inspections Of TRADER SPORTS in 2002 and 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Report Of Violations And Notice Of Revocation Underlying The Administrative Revocation Proceedings . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Administrative Revocation Hearing . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    The Final Notice of Revocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Overview Of The "One Time In Twelve Months Inspection Rule". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    TRADER SPORTS Is Entitled To Summary Judgment As A Matter Of Law Because The Administrative Revocation Hearing And Resultant Final Revocation Notice Are The Direct Product Of Defendants' Unconstitutional And Unlawful Warrantless Inspection Of TRADER SPORTS Conducted In Violation Of The "One Time In Twelve Months Inspection Rule". . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    Defendants' Contrary Interpretation Of The Statute Via The Unpublished And Uncodified Internal Memorandum Is Not Entitled To Administrative Deference, And Defendants' Reliance Thereon Is Arbitrary, Capricious, And Contrary To Law. . . . . . . . . . . . . . . . . . 12

    D.    Suppression Of The Proceeds Of The Illegal 2003 Inspection, As Demanded By TRADER SPORTS At The Administrative Level But Rejected By Defendants Contrary To Applicable Law, Is The Appropriate Remedy In This Case To Deter The ATF's Willful And Unlawful Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

**Case(s)**                                                                    **Page(s)**

*Alaska Prof'l Hunters Ass'n v. Federal Aviation Admin.*,
    177 F.3d 1030 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bonnischen v. United States*,
    217 F.Supp.2d 1116 (D. Oregon 2002) . . . . . . . . . . . . . . . . . . . . . . . 12

*British Airways Board v. Boeing Co.*,
    585 F.2d 946 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Calandra v. United States*,
    414 U.S. 338 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Camara v. Municipal Court*,
    387 U.S. 523 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

*Commodity Futures Trading Comm'n v. Savage*,
    611 F.2d 270 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Katz v. United States*,
    389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Mallory v. United States*,
    354 U.S. 449 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Miller v. United States*,
    357 U.S. 301 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Murray v. United States*,
    487 U.S. 533 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Nardone v. United States*,
    308 U.S. 338 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Olmstead v. United States*,
    277 U.S. 438 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*One 1958 Plymouth Sedan v. Pennsylvania*,
    380 U.S. 693 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rank v. Nimmo*,
    677 F.3d 692 (9th Cir. 1982, *cert. denied*,
    459 U.S. 907 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rea v. United States*,
    350 U.S. 214 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*See v. City of Seattle*,
    387 U.S. 541 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# TABLE OF AUTHORITIES

## Case(s)

Page(s)

*Stinson v. United States,*
    508 U.S. 36 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Biswell,*
    406 U.S. 311 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Blank,*
    261 F.Supp.180 (ND Ohio 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Caceres,*
    440 U.S. 741 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Gantt,*
    194 F.3d 987 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Harrington,*
    681 F.2d. 612 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Hasting,*
    461 U.S. 499, 103 S.Ct. 1974 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Marts,*
    986 F.2d 1216 (8th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Samango,*
    607 F.2d 877 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Soto-Soto,*
    598 F.2d 545 (9th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wong Sun v United States,*
    371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Statutes

18 U.S.C. § 922(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 923 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 923(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 923(g)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

18 U.S.C. § 923(g)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . 1, 7, 13, 14, 21

18 U.S.C. §§ 921 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5 U.S.C. §§ 706(2)(A) & (D) . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 15, 21

1

# TABLE OF AUTHORITIES

2

**Statutes**

3
                                            **Page(s)**

4
Fed Federal Rule of Civil Procedure 41(c) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5
Federal Rule of Civil Procedure 56 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6
Federal Rule of Civil Procedure 56(a),(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7

**Regulations**

8
9
27 C.F.R. § 478.23 (B)(2)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14, 15

10

**Miscellaneous**

11
12
*Hardy, The Firearm Owners' Protection Act: A Historical Perspective,*
        17 Cumb. L.Rev. 585, 608 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

13
*Hearing on S. 49 – "Protecting Firearm Owners' Constitutional Rights, Civil
Liberties, and Rights to Privacy,"*
14
        99th Cong., 1st. Sess. (1985), 131 CONG.REC. S23-03 . . . . . . . . . . . . . 8

15
*House Report,* No. 99-495, 99th Cong.  2nd Sess. 1986, 1986 WL 31888;
16
        132 CONG. REC. S5367-68 (daily ed. May 6, 1986) . . . . . . . . . . . . . . . 9

*Oversight Hearings on BATF, Part 2, before Senate Comm. on Appropriations,*
17
        96th Cong., 2d Sess. (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18
*Proceedings and Debates of the 99th Congress,* 99th Cong.,
19
        1st. Sess. (June 24, 1985), 131 CONG.REC. S8686-01 . . . . . . . . . . . . . 9

*Public Law 99-308,* 100 Stat. 449 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
20

*The Firearm Owners' Protection Act: Hearings on S. 1030 before the Senate
21
Judiciary Comm.,*
        97th Cong., 1st & 2d Sess. 3-22 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 8

22

23

24

25

26

27

28

## I.

## **INTRODUCTION**

Plaintiff/Petitioner, TRADER SPORTS, INC. dba THE TRADERS ("TRADER SPORTS"), filed and served a timely petition for de novo judicial review under 18 U.S.C. § 923(f)(3) and a Complaint for injunctive and declaratory relief ("the Complaint") against Defendants/Respondents ALBERTO GONZALES, Attorney General, United States Department of Justice; CARL J. TRUSCOTT, Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice ("ATF"); and, MARY LERCH, Director of Industry Operations, San Francisco Field Division, ATF, United States Department of Justice (collectively "Defendants").  TRADER SPORTS seeks de novo statutory review of a "Final Notice of Denial of Application or Revocation of Firearms License" ("Final Revocation Notice") issued on December 23, 2005 by the ATF revoking TRADER SPORTS' federal firearm's license, following an ATF administrative hearing conducted on November 16 and 17, 2004.

In pertinent part, the Complaint seeks declaratory relief and reinstatement of TRADER SPORTS' federal firearms license on the grounds the underlying administrative hearing and the resultant Final Revocation Notice are unlawful because they are the direct product of Defendants' warrantless inspection conducted in violation of the "one time in twelve months inspection rule" codified at 18 U.S.C. § 923(g)(1)(B)(ii).  *Complaint at ¶¶ 18-21, 45-49, 148-150.*  This overarching claim is dispositive of the other claims raised in the Complaint, including TRADER SPORTS' claim for de novo judicial review of Defendants' purported administrative findings under 18 U.S.C. § 923(f)(3).  TRADER SPORTS demanded suppression of the proceeds of the illegal inspection at the administrative level. The Hearing Officer and the Director of Industry Operations, contrary to law, erroneously failed to exclude the product of the illegal inspection which would have removed the entire evidentiary predicate for the administrative

1

1   proceedings and the Final Revocation Notice issued by Defendants following that
2   hearing.

3     As explained below:  (1) Defendants' interpretation and application of the
4   "one time in twelve months inspection rule" in this case is clearly erroneous and
5   contrary to law because the twelve month time period specified by Congress runs
6   from the date the prior inspection ended, rather than the date it commenced;
7   (2) Defendants' contrary interpretation of the inspection rule via an unpublished
8   internal memorandum is arbitrary and not entitled to administrative deference
9   under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837
10  (1984) and its progeny; and, (3) the Court has the explicit statutory authority
11  under 5 U.S.C. §§ 706(2)(A) & (D) to set aside the revocation as arbitrary,
12  capricious, and contrary to law, and likewise possesses the independent
13  supervisory authority to suppress the fruits of the unlawful inspection because the
14  "one time in twelve months inspection rule" itself is a codification of the
15  Constitutional protections afforded by Fourth Amendment for which the remedy of
16  suppression must be applied by reference to the Exclusionary Rule.  For that
17  reason, Defendants' willful violation of the inspection statute is not merely
18  precatory and the only appropriate remedy for that illegal act is the setting aside
19  of the license revocation and suppression of the evidence seized during the
20  unlawful inspection.

21    Accordingly, TRADER SPORTS is entitled to summary judgment setting
22  aside the unlawful revocation as a matter of law.

23  **II.**

24  **<u>FACTS</u>**

25  **A. The ATF's Warrantless Inspections Of TRADER SPORTS in 2002
    and 2003.**
26

27    Like other licensees, TRADER SPORTS has had multiple on-site
28  "compliance" inspections over the years by federal and state authorities and,

2

1  because of the myriad technical regulations applicable to firearms dealers, has

2  received audit reports requesting clarification or modification of its record keeping

3  and business practices.  One such regularly conducted warrantless inspection

4  was commenced by Defendants on July 15, 2002 (the "2002 inspection"). *See,*

5  *Firearms Compliance Inspection Work Program Worksheet, Exh. A.*

6        The "2002 inspection" was typical of the warrantless compliance

7  inspections conducted by Defendants of this licensee over the years between

8  1983 and 2002.  The visit, which was conducted by one or two BATFE inspectors

9  in a reasonable manner and limited in its scope to transactions and records

10  generated within the past business year, affirmed TRADER SPORTS was in

11  substantial compliance with federal law, not in willful violation thereof, and left

12  TRADER SPORTS with the opportunity to cure any inadvertent errors or

13  deficiencies discovered in the records.  *Declaration of Anthony Cucchiara in*

14  *Support of Motion for Preliminary Injunction ("Cucchiara Dec.") at  ¶¶ 17, 19, Exh.*

15  *B.*

16        On September 27, 2002, the ATF conducted a Closing Conference as part

17  of the 2002 inspection process.  *Hearing Testimony of Jun Tucay at 261:4-262:4,*

18  *Exh. C; Diary Entry of ATF Inspector Ronald Borg, Exh. D.*  According to the

19  ATF's own internal records, the 2002 inspection ended on October 16, 2002.

20  *Firearms Compliance Inspection Work Program Worksheet, Exh. A.*

21        <u>Less than twelve months later</u>, commencing on September 2, 2003,

22  Defendants conducted another statutorily authorized warrantless on-site

23  inspection of TRADER SPORTS (the "2003 inspection").  *Cucchiara Dec. at ¶ 20,*

24  *Exh. B; Hearing Testimony of ATF Inspector Amy Olsweski at 38:24-39:10, Exh.*

25  *E.*  The 2003 inspection was conducted by ATF Industry Operations Inspector

26  Amy Olszweski on the instructions of ATF Director of Industry Operations MARY

27  LERCH ("LERCH").  Unlike the past inspections in which only one or two ATF

28  inspectors had conducted the inspection, the 2003 inspection was conducted by

1   the unprecedented number of approximately fifteen additional ATF inspectors

2   from all over Northern California and Nevada. *Cucchiara Dec. at ¶ 21, Exh. B;*

3   *Department of Justice Assignment and Report at p. 2, Exh. F.*

4        The 2003 inspection went well beyond the pale of any legitimate or

5   reasonable annual "compliance" inspection.   It exceeded the scope and duration

6   of any prior inspection, was conducted in an unreasonable manner, interfered

7   with TRADER SPORTS' normal business operations, and singled it out for the

8   preordained purpose of revoking the license and closing the business.[1]

9        The team of ATF inspectors were on-site for several months at great

10  disruption and expense to TRADER SPORTS and its customers.  The inspectors

11  literally turned the business upside down demanding to examine records dating

12  back as far as 1967 under the pretense of an annual "compliance" inspection,

13  without first determining whether corrections suggested by previous inspections,

14  which had been represented by Defendants themselves to be thorough and

15  complete, had been accomplished.  Nor did Defendants provide any explanation

16  for their continued examination of issues which had long since been resolved in

17  connection with the prior inspections. *Cucchiara Dec. at  ¶ 23, Exh. B.*

18  **B.    The Report Of Violations And Notice Of Revocation Underlying
          The Administrative Revocation Proceedings.**
19

20       As preordained, the 2003 inspection culminated in a Report of Violations

21  issued to TRADER SPORTS on or about December 8, 2003. *Report of*

22  *Violations*, Exh. G.   Unlike the previous or like industry inspections, no

23  _____

24       [1] The intent to revoke was demonstrated, not only by the extraordinary
     scope of the inspection and the number of inspectors assigned, but is also
25   evidenced by the fact that even though the inspectors had not yet seen the
     records to be reviewed, Ms. Olszewski arrived at the inspection armed with a
26   letter prepared in advance by Ms. LERCH, both prejudging the record keeping
     system and rescinding a variance previously granted TRADER SPORTS
27   permitting it to maintain acquisition and disposition records in a computerized
     format.  *Cucchiara Dec. at  ¶22, Exh. B; ATF Letter, September 2, 2003, Exh. H.*
28

4

1  reasonable opportunity was offered to cure any alleged errors, but instead,
2  Defendants sought revocation. *Cucchiara Dec. at ¶¶ 24, 33, Exh. B.*
3      A Notice of Revocation signed by Ms. LERCH was delivered to TRADER
4  SPORTS on July 29, 2004, revoking the license effective September 30, 2004.
5  *Revocation Notice, Exh. I.*
6      **C.    The Administrative Revocation Hearing.**
7      TRADER SPORTS timely requested a hearing to contest the revocation
8  pursuant to 18 U.S.C. § 923(f)(2).  The hearing was held on November 16 and
9  17, 2004, at the ATF's Field Office in Dublin, California, and was conducted by
10  Hearing Officer Kim K. Kratochvil (the "Hearing Officer"), an ATF employee
11  whose assignment had been requested by Ms. LERCH.
12      **D.    The Final Notice of Revocation.**
13      On December 27, 2005 – some thirteen months after the revocation
14  hearing had concluded – TRADER SPORTS received a forty-six page "Final
15  Notice of Denial of Application or Revocation of Firearms License" ("Final
16  Revocation Notice").  *Final Revocation Notice, Exh. J.*
17      The Final Revocation Notice was preceded by the Hearing Officer's report
18  of decision recommending revocation, which was adopted in its entirety by Ms.
19  LERCH on behalf of the ATF.  *Hearing Officer's Report of Decision, Exh. K.*  In
20  pertinent part, both the Hearing Officer's decision and the Final Revocation
21  Notice rejected TRADER SPORTS' claim that the 2003 inspection was
22  conducted in violation of the "one time in twelve months inspection rule," and
23  likewise rejected its request for suppression of the proceeds of that unlawful
24  inspection, expressly relying upon an uncodified ATF internal Memorandum
25  dated April 10, 2003 entitled "*Annual Right of Entry for Federal Firearms Licensee
26  Annual Inspections*" and stating that the twelve month inspection period specified
27  by Congress runs from the date the prior inspection began, rather than the date it
28  had ended.  *ATF Memorandum dated April 10, 2003, Exh. L.*  That Memorandum,

1   which purported to "clarify" ATF internal policy "regarding inspectors' annual right

2   of entry to inspect Federal Firearms Licensees," was referenced in the

3   administrative hearing testimony of ATF Area Supervisor Dennis Anderson and

4   was introduced into the record by the ATF to refute Inspector Jun Tucay's

5   testimony at the hearing in which he admitted the ATF had violated the "one time

6   in twelve months inspection rule" by conducting the 2003 inspection too early.

7   *See, Hearing Testimony of Dennis Anderson at 326:18-327:25 , Exh. M*

8   (referencing the Memo and discussing BATFE "internal policy" concerning its

9   interpretation of the statutory "one time in twelve months inspection rule");

10   *Defendants' Post-Hearing Letter Brief at p. 1, n. 1, Exh. N* (referencing the

11   Memo); *Hearing Officer's Report at pp. 5 and 30-31, Exh. K* (referencing the

12   Memo and concluding it "refutes the brief submitted by counsel for the licensee");

13   *and, Final Revocation Notice at pp. 31-33, Exh. J (*rejecting Inspector Tucay's

14   hearing testimony and concluding "the Licensee was not inspected more than

15   once in twelve months.")

16                                          **III.**

17                                   **ARGUMENT**

18   **A.      Overview Of The "One Time In Twelve Months Inspection Rule".**

19           The Fourth Amendment to the United States Constitution imposes a

20   presumptive warrant requirement and protects all persons, including businesses,

21   from unreasonable searches and seizures conducted by government agents.

22   *Katz v. United States*, 389 U.S. 347, 357 (1967); *See v. City of Seattle*, 387 U.S.

23   541 (1967).

24           The federal Gun Control Act (the "GCA"), 18 U.S.C. §§ 921 *et seq.*,

25   requires persons in business as an importer, manufacturer, or dealer in firearms

26   to be licensed by the Attorney General, and permits the ATF the opportunity to

27   inspect a licencee for compliance with its recordkeeping requirements. *18 U.S.C.*

28   *§§ 922(a), 923.* The licensing scheme however, also imposes important

1   Constitutional and statutory limits on the ATF's inspection authority.  To protect a

2   licensee from oppressive, unreasonable,  and warrantless searches, Congress

3   enacted the Firearm Owners' Protection Act (the "FOPA"), codified at 18 U.S.C. §

4   923(g)(1)(B)(ii) and 27 C.F.R. § 478.23 (B)(2)(I).  It provides that a licensed

5   firearms dealer may be subject to a warrantless on-site inspection for the purpose

6   of ensuring compliance with the record keeping requirements "*not more than*

7   *once during any 12-month period*" (the "one time in twelve months inspection

8   rule").[2]

9          The "one time in twelve months inspection" rule is rooted in the Fourth

10  Amendment and the Federal Privacy Act, and was enacted by Congress to

11  preserve the licensee's fundamental constitutional rights of privacy, and to

12  narrowly circumscribe warrantless searches and seizures.[3]   A brief review of the

13  FOPA's legislative history illuminates the Constitutional underpinnings of the

14  rule.

15         Beginning in early 1979, Senate hearings publicized a number of cases

16  involving allegations of flagrant abuses of ATF enforcement powers and

17  harassment of licensees through the inspection process, which was later cited as

18  the empirical foundation for the passage of the FOPA.   *Oversight Hearings on*

19  *BATF, Part 2, before Senate Comm. on Appropriations*, 96th Cong., 2d Sess.

20

21         [2] 18 U.S.C. § 923(g)(1)(B)(ii) provides, in very explicit terms, that:

22

23  "(B)The Attorney General may inspect or reexamine the inventory
    and records of a licensed . . . dealer without such reasonable cause

24  or warrant –
    . . .

25  (ii) *not more than once during any 12-month period*;"

26         [3] Before the FOPA was enacted in 1986, the Gun Control Act  permitted
    warrantless inspection of a firearm licensee's premises "at all reasonable times,"

27  and broadly authorized the ATF to routinely require submission of reports on the
    content of the licensee's records.

28

7

1    (1980).  Within months of the first hearings, the earliest versions of the FOPA

2    were introduced in both the House and Senate.  These versions proposed

3    extensive amendments to the GCA, with one of its principal provisions aimed at

4    curtailing warrantless inspections of licensees' business premises.

5         While these original forms of the FOPA saw no final legislative action, a

6    successor bill, S. 1030, was introduced in the Ninety-seventh Congress in 1982.

7    *The Firearm Owners' Protection Act: Hearings on S. 1030 before the Senate*

8    *Judiciary Comm.*, 97th Cong., 1st & 2d Sess. 3-22 (1982).  As introduced, S.

9    1030 added a prefatory statement of its purpose, <u>citing the objective of protecting</u>

10   <u>individual rights under the Second, Fourth, Fifth, Ninth and Tenth Amendments</u>

11   <u>along with rights granted under the federal Privacy Act</u>.  *Id.; see also, Hardy, The*

12   *Firearm Owners' Protection Act: A Historical Perspective*, 17 Cumb. L.Rev. 585,

13   608 (1986) (recounting legislative history of the FOPA).

14        Although S. 1030 died in the Ninety-seventh Congress, it was later

15   reintroduced as S. 49 in the Ninety-ninth Congress in January 1985 by the then

16   majority leader, Senator Robert Dole, and Senator McClure.  In introducing S. 49

17   – which was the counterpart to the FOPA later passed by the House of

18   Representatives –  Senator McClure described the intent of the legislation:

19        I am today introducing legislation which would correct some of the
         more egregious abuses of the 1968 Gun Control Act.
20
         . . .
21
         When Congress enacted the Gun Control Act of 1968, it intended to
22       curb violent firearms crime by controlling the sale, transportation, and
         possession of guns.  Did this approach work?  No; it did not.
23       Extensive hearings and study of this law clearly show that the ones
         who bear the brunt of this law are not necessarily the most
24       dangerous criminals.  The ones who have been harassed by the
         enforcement of this act are often innocent men and women who
25       have bungled their paperwork.  Punishment has been swift and
         severe.  **While genuine criminals are all to often let free to roam**
26       **the streets, these law-abiding gun owners and dealers have had**
         **their property unconstitutionally seized and held and their**
27       **businesses and lives ruined.**

28   *Hearing on S. 49 – "Protecting Firearm Owners' Constitutional Rights, Civil*

1    *Liberties, and Rights to Privacy*," 99th Cong., 1st. Sess. (1985), 131 CONG.REC.

2    S23-03, emphasis added. On July 9, 1985, S. 49 passed the Senate. In his

3    statement to the full Senate, Senator Orrin Hatch described that a primary

4    component of the legislation was to limit compliance inspections to once every

5    year to inhibit the ATF from conducting warrantless "fishing expeditions" for

6    inadvertent dealer recordkeeping violations:

> INSPECTIONS. Under current law, a dealer's records and inventory can be inspected by Federal officials at any time during business hours without prior notice. There are no restrictions on the number of inspections or on the use of information gathered during these inspections. Unannounced searches have become "fishing expeditions" for inadvertent recordkeeping violations. S. 49 permits only one warrantless compliance inspection per year after reasonable notice. . ..
>
> These restrictions only apply to compliance inspections. The primary purpose of these compliance inspections is to instruct the dealer in the operation of the law.

14    *Proceedings and Debates of the 99th Congress,* 99th Cong., 1st. Sess. (June 24,

15    1985), 131 CONG.REC. S8686-01.

16        The FOPA was overwhelmingly passed by Congress in May 1986. *See,*

17    *House Report*, No. 99-495, 99th Cong. 2nd Sess. 1986, 1986 WL 31888; 132

18    CONG. REC. S5367-68 (daily ed. May 6, 1986); *Public Law 99-308,* 100 Stat.

19    449. Prior to its passage, FOPA's sponsor in the House, Representative

20    Volkmer, addressed the full House floor, emphasizing that the purpose of the

21    legislation was to ". . . assure that the civil rights of our 200,000 licensed firearms

22    dealers and 80 million firearms owners and collectors will not be abused."

23    *Proceedings and Debates of the 99th Congress,* 99th Cong., 2nd. Sess. (April 9,

24    1986), 132 CONG.REC. H1649-03.

25        The impact of FOPA on existing firearm laws was comprehensive in its

26    application. Every significant aspect of the Gun Control Act of 1968, from its

27    purpose clause to penalties, was re-focused, resulting in the constriction, rather

28    than the expansion of, enforcement, inspection, and administrative powers given

1    to the ATF.  Consistent with that constitutionally-based mandate, and to de-limit

2    ATF compliance inspections undertaken without a warrant, the FOPA explicitly

3    permits only <u>one warrantless compliance inspection "during any 12-month</u>

4    <u>period</u>."[4]

5              **B.      TRADER SPORTS Is Entitled To Summary Judgment As A**
              **Matter Of Law Because The Administrative Revocation Hearing**
6              **And Resultant Final Revocation Notice Are The Direct Product**
              **Of Defendants' Unconstitutional And Unlawful Warrantless**
7              **Inspection Of TRADER SPORTS Conducted In Violation Of The**
              **"One Time In Twelve Months Inspection Rule".**
8

9              Pursuant to Federal Rule of Civil Procedure 56 (c), summary judgment is

10    proper "if the pleadings . . . together with affidavits, if any, show there is no

11    genuine issue as to any material fact, and the moving party is entitled to judgment

12    as a matter of law."   Upon a showing that there is no genuine issue of material

13    fact as to a particular claim or defense, the Court may grant summary judgment in

14    the party's favor "upon all or any party thereof. " *FRCP 56(a),(b).*

15              Although all facts and inferences drawn must be viewed in the light most

16    favorable to the nonmoving party, if the moving party meets is burden, the

17    responding party may not defeat a motion for summary judgment "in the absence

18    of any significant probative evidence tending to support his or her legal theory."

19    *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir.

20    1979).  Summary judgment cannot be avoided solely on conclusory allegations,

21    legal memoranda, or oral argument as they do not create issues of fact capable

22    of defeating an otherwise valid motion for summary judgment. *British Airways*

23    *Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).

24              Applying these principles, TRADER SPORTS is entitled to summary

25    judgment as a matter of law.  The administrative record, supplemented by internal

26    _____

27              [4] The FOPA specifies that any additional administrative inspections of a
      licensee's records within the same twelve month period must be supported by a
28    magistrate's warrant, and based on a showing of reasonable cause to believe
      evidence of a violation may be found.  *18 U.S.C. § 923(g)(1)(A).*

1   documents prepared by Defendants contemporaneous with the 2002 and 2003

2   inspections, establish there are no genuine issues as to any material facts

3   underlying TRADER SPORTS' claim that Defendants' warrantless 2003

4   inspection was conducted in plain violation of the "one time in twelve months

5   inspection rule" and that suppression is the appropriate remedy as a matter of law

6   because the 2003 inspection was commenced at a time less than twelve months

7   after the previous warrantless inspection conducted in 2002 had concluded.

8          To that end, it is undisputed that the 2003 inspection <u>commenced on</u>

9   <u>September 2, 2003</u>.   ATF Inspector Jun Tucay testified that the prior, 2002

10  compliance inspection of TRADER SPORTS, <u>ended at the earliest on September</u>

11  <u>27, 2002</u>, at the time the Closing Conference was conducted.   *Hearing Testimony*

12  *of Jun Tucay at 269:25-270:7, Exh. C.*   ATF inspector Jun Tucay also testified at

13  the administrative hearing that:  it was internal ATF policy in to calculate the

14  twelve month inspection time period from the date the last inspection ended, not

15  the date the prior inspection commenced; the twelve month period runs from the

16  date the prior year's inspection is closed, which occurs after the Closing

17  Conference takes place; and, the 2003 inspection was commenced less than

18  twelve months later.  *See, Hearing Testimony of Jun Tucay at 277:18-278:10,*

19  *Exh. C* .

20         At the earliest, an inspection ends at the time the Closing Conference is

21  conducted with the licensee and not at any time sooner.  Until the Closing

22  Conference is completed, inspectors may, and do collect more information from

23  the firearms dealer, and the inspection process remains active and open.  *Reply*

24  *Declaration of Former ATF Inspector and Hearing Officer Ron White in Support of*

25  *Motion for Preliminary Injunction ("White Decl.") at ¶¶ 18-20, Exh. O.*  That

26  occurred here.

27         During the Closing Conference conducted on September 27, 2002, the

28  ATF continued to actively inspect TRADER SPORTS by demanding that it

1  continue to provide information and documentation, including inventory

2  reconciliation printouts. *Hearing Testimony of Jun Tucay at 261:4-262:4, Exh. C*

3  (testifying the ATF continued to request a computer inventory print-out at the

4  Closing Conference). In any event, according to the ATF's internal records, the

5  2002 inspection ended on October 16, 2002. *Firearms Compliance Inspection*

6  *Work Program Worksheet, Exh. A.*

7       Because the 2003 inspection was begun less than twelve months after the

8  2002 inspection had ended, the ATF exceeded its limited statutory inspection

9  authority granted by Congress by conducting a second warrantless inspection of

10  TRADER SPORTS "more than once during [a] twelve month period."

11  **C.    Defendants' Contrary Interpretation Of The Statute Via The**
         **Unpublished And Uncodified Internal Memorandum Is Not**
12       **Entitled To Administrative Deference, And Defendants' Reliance**
         **Thereon Is Arbitrary, Capricious, And Contrary To Law.**
13

14       When an administrative agency's action turns upon the construction and

15  application of a statute, the reviewing Court must first consider whether the

16  agency correctly interpreted the statute and applied the correct legal standards.

17  If it did not, the agency's action is "arbitrary, capricious, an abuse of discretion, or

18  otherwise not in accordance with the law." *See generally, Bonnischen v. United*

19  *States*, 217 F.Supp.2d 1116, 1132 (D. Oregon 2002); *5 U.S.C. §§ 706(2)(A) &*

20  *(D); Stinson v. United States*, 508 U.S. 36, 45 (1993) (agency's interpretation

21  cannot be sustained if it is "plainly erroneous or inconsistent with the regulation.")

22       Defendants' interpretation of the "one time in twelve months inspection

23  rule" through the unpublished and uncodified ATF internal Memorandum entitled

24  "*Annual Right of Entry for Federal Firearms Licensee Annual Inspections*" (stating

25  that the twelve month inspection period specified by Congress runs from the date

26  the prior inspection commenced, rather than ended) is plainly erroneous,  is not

27  entitled to administrative deference, and Defendants' reliance thereon in issuing

28

1    the Final Revocation Notice is arbitrary and capricious and contrary to law.[5]

2         Following the doctrine first announced in *Chevron U.S.A., Inc. v. Natural*

3    *Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984), where a party challenges an

4    agency's regulatory interpretation as contrary to the terms, legislative history, and

5    purpose of a statutory scheme enacted by Congress, the Court must first

6    consider "whether Congress has directly spoken to the precise question at issue.

7    If the intent of Congress is clear, that is the end of the matter; for the court as well

8    as the agency must give effect to the unambiguously expressed intent of

9    Congress."   *Id.* at 842-43.  Further, while Congress may "leave a gap for the

10   agency to fill" through an express or implicit delegation of authority "to elucidate a

11   specific provision of the statute by regulation," such regulations may not be given

12   controlling weight if they are "arbitrary, capricious, or manifestly contrary to the

13   statute." *Id.* at 843-44.

14        In this instance, Congress has not "explicitly left a gap" for the ATF to fill or

15   otherwise made a delegation to the ATF which would require *Chevron* deference

16   because Congress has spoken definitively on the issue of warrantless searches

17   of firearms licensees.  Nor is the relevant statute, 18 U.S.C. § 923(g)(1)(B)(ii),

18   "silent" with respect to the "specific issue," for it states unequivocally that the ATF

19   may conduct a warrantless inspection *not more than once during any 12-month*

20   *period. Id.* at 843.

21   _____

22        [5] Defendants' improper reliance on the unpublished Memorandum is also
     inimical to the ATF's limited delegated power to establish rules <u>only by regulation</u>.
23   *See e.g., 18 U.S.C. § (g)(1)(A)* ("Each . . . licensed dealer shall maintain such
     records . . . at his place of business for such period, and in such form, as the
24   Attorney General may *by regulations prescribe*."); *Alaska Prof'l Hunters Ass'n v.*
     *Federal Aviation Admin.*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) ("Those regulated
25   by an administrative agency are entitled to `know the rules by which the game will
     be played.'"); *Rank v. Nimmo*, 677 F.3d 692, 698 (9th Cir. 1982, *cert. denied*, 459
26   U.S. 907 (1982) (administrative policy must be promulgated "pursuant to a
     specific statutory grant of authority," and policy not "neither published in the
27   Federal Register nor disseminated to the public for scrutiny and comment" does
     not have the force and effect of law.")
28
                                           13

1     The reason for Congress' lack of silence is readily apparent when Section

2   923(g)(1)(B)(ii) is placed in historical context.  As indicated, the "one time in

3   twelve months inspection" rule is rooted in the Fourth Amendment and the

4   Federal Privacy Act, and was enacted by Congress to preserve the licensee's

5   fundamental constitutional rights of privacy, and to expressly limit, rather than

6   expand, the ATF's prior unchecked power to conduct warrantless administrative

7   inspections of a firearm licensee's premises "at all reasonable times."

8     The lack of ambiguity in the statute is further borne out by the language

9   and structure of the ATF's own regulation implementing the statute.  The

10   pertinent regulation, 27 C.F.R. § 478.23 (B)(2)(I), mirrors the terms of the statute,

11   providing that the ATF may conduct a warrantless inspection "[f]or insuring

12   compliance with the recordkeeping requirements . . . [n]ot more than once during

13   any 12-month period."  If Congress, or even the ATF, had intended to shorten the

14   twelve-month time period by permitting the ATF to commence an inspection less

15   than twelve months after a prior inspection had ended, the language of both the

16   statute and the regulation in issue would not be so specific in stating that the ATF

17   "may inspect . . . not more than once during any 12-month time period."

18   Obviously, an inspection must have a beginning and an end, so it is entirely

19   reasonable to conclude from the language of the statute that Congress intended,

20   by its use of the word "inspect," to permit warrantless inspections to occur at the

21   earliest twelve months after the prior inspection ended.

22     Defendants' proffered interpretation of the statute and reliance on that

23   interpretation is illogical.   The ATF, not the licensee, controls the timing, duration,

24   and scope of the inspection process, which, by definition, must have a beginning

25   and an end.  Until the inspection is "closed" by the ATF, it may continue to inspect

26   the premises and demand that the licensee provide records to ensure

27   compliance.   If Defendants' arbitrary interpretation were adopted, the ATF, which

28   unilaterally controls the inspection process, could effectively maintain a constant

14

1   state of dealer inspection by keeping inspections open, or could otherwise

2   commence a "new" inspection every few months or every few weeks by simply

3   and arbitrarily delaying "closure" of the previous inspection.  That cannot be the

4   law, nor did Congress so intend.

5          In sum, the newly "clarified" regulatory interpretation advanced by

6   Defendants' and relied upon by the Hearing Officer and Ms. LERCH in issuing the

7   Final Revocation Notice is arbitrary and capricious, and is not entitled to

8   administrative deference under *Chevron*.  Instead, the ATF's interpretation is

9   authoritatively foreclosed by the plain language and structure of the statutory

10  scheme, the history pre-dating its enactment and the public policies to be served,

11  and by the language of the ATF's companion regulation itself.

**D.   Suppression Of The Proceeds Of The Illegal 2003 Inspection, As
Demanded By TRADER SPORTS At The Administrative Level
But Rejected By Defendants Contrary To Applicable Law, Is The
Appropriate Remedy In This Case To Deter The ATF's Willful
And Unlawful Conduct.**

15         Suppression of the proceeds and alleged violations derived from the 2003

16  inspection, demanded by TRADER SPORTS at the administrative level, is the

17  appropriate remedy in this case consistent with applicable law.  As the reviewing

18  court, this Court has the explicit independent statutory obligation to suppress the

19  proceeds of the inspection as "evidence" in the administrative proceedings under

20  5 U.S.C. §§ 706(2)(A) & (D) and set aside the revocation because the inspection

21  itself and Defendants' subsequent rejection of TRADER SPORT's suppression

22  request at the administrative hearing were conducted "not in accordance with

23  law" and "without observance of procedure required by law."   Defendants'

24  violation of its own regulation,  27 C.F.R. § 478.23 (B)(2)(I), also requires this

25  Court to suppress the "evidence" derived from the unlawful inspection pursuant to

26  5 U.S.C. § 706.  *Cf. United States v. Caceres*, 440 U.S. 741, 754 (1979) ("Agency

27  violations of their own regulations, whether or not also in violation of the

28  Constitution, may well be inconsistent with the standards of agency actions which

1   the APA directs the courts to enforce.")

2          While suppression of evidence derived from an illegal and unconstitutional

3   search is ordinarily a remedy reserved for criminal cases, it is not exclusively so.

4   Where, as here, the search conducted by Defendants wilfully violates both the

5   Constitution and a statutory Congressional mandate directed at the very conduct

6   in question, both the reviewing court and the underlying adminstrative body,

7   consistent with applicable law, have the affirmative obligation to enforce those

8   rights through the remedy of suppression in the exercise of their supervisory

9   powers.   The Supreme Court in *United States v. Hasting,* 461 U.S. 499, 103

10  S.Ct. 1974, 1978 (1983), described the Court's supervisory power as follows:

11          "[G]uided by considerations of justice," *McNabb v. United States,* 318
            U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943), and in the
12          exercise of supervisory powers, federal courts may, within limits,
            formulate procedural rules not specifically required by the
13          Constitution or the Congress. The purposes underlying use of the
            supervisory powers are threefold: to implement a remedy for
14          violation of recognized rights, to preserve judicial integrity by
            ensuring that a conviction rests on appropriate considerations validly
15          before the jury, and finally, as a remedy designed to deter illegal conduct.
            (Citation omitted.)
16

17          In *Rea v. United States,* 350 U.S. 214 (1956), the Supreme Court

18  addressed a government agent's violation of Fed.R.Crim.P. 41(c) by seizing

19  property under an insufficient warrant based on unsworn statements, in an

20  otherwise constitutional seizure. The question before the Court was whether the

21  agent could present the evidence in a state prosecution he had initiated. The

22  Court noted: "We put all the constitutional questions to one side.  [W]e have then

23  a case that raises not a constitutional question but one concerning our

24  supervisory powers over federal law enforcement agencies." *Id.* at 216-217. The

25  Court then determined that suppression <u>was required</u> because the Federal Rules

26  "are designed to protect the privacy of the citizen, unless the strict standards set

27  for searches and seizures are satisfied.  That policy is defeated if the federal

28  agent can flout them and use the fruits of his unlawful act either in federal or state

1  proceedings." *Id.* at 218.

2          The propriety of this Court's use of its supervisory powers to remedy

3  Defendants' wilful misconduct in this case was also powerfully expressed by

4  Justice Brandeis in his famous dissenting opinion in *Olmstead v. United States*,

5  277 U.S. 438, 471-485 (1928):

6          Decency, security and liberty alike demand that government officials
           shall be subjected to the same rules of conduct that are commands
7          to the citizen.  In a government of laws, existence of the government
           will be imperilled if it fails to observe the law scrupulously. Our
8          government is the potent, the omnipresent teacher. For good or for
           ill, it teaches the whole people by its example. Crime is contagious. If
9          the Government becomes a lawbreaker, it breeds contempt for law; it
           invites every man to become a law unto himself; it invites anarchy.
10         To declare that in the administration of the criminal law the end
           justifies the means to declare that the government may commit
11         crimes in order to secure the conviction of a private criminal would
           bring terrible retribution. Against that pernicious doctrine this Court
12         should resolutely set its face.

13         The government's unlawful misconduct in this case does not simply involve

14  the question of an illegal search and seizure conducted in violation of a statute

15  enacted by Congress.  Rather, the ATF's unauthorized and continued

16  "institutional bad faith" misuse of the limited warrantless inspection authority

17  provided to it by Congress constitutes a form of agency abuse and governmental

18  misconduct which has appropriately resulted in judicial condemnation through the

19  Court's exercise of its supervisory powers. *See e.g., United States v. Samango*,

20  607 F.2d 877 (9th Cir. 1979).

21         Application of this Court's supervisory power is particularly appropriate

22  where evidence is obtained in violation of Federal statutes or Federal rules of

23  procedure and an underlying Constitutional right is implicated such as the right to

24  be free from unreasonable search and seizure.  *See Miller v. United States*, 357

25  U.S. 301 (1958) (excluding money seized because federal officers violated 18

26  U.S.C. § 3109 by breaking through a door without indicating their authority and

27  purpose to arrest); *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir.1979)

28  (suppressing evidence obtained by an illegal border search in violation of federal

17

statutes); *United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999) (failure to give

defendant a complete copy of search warrant justified suppression of evidence

for violation of Rule 41 of the Federal Rules of Criminal Procedure); *United States*

*v. Marts,* 986 F.2d 1216 (8th Cir.1993) (suppression due to 18 U.S.C. § 3109

knock and announce violation); *Mallory v. United States*, 354 U.S. 449 (1957)

(suppressing confession obtained as a result of the government's violation of

Rule 5 of the Federal Rules of Criminal Procedure); *Cf. United States v.*

*Harrington*, 681 F.2d. 612, 615 (9th Cir. 1982) (declining to decide whether "the

exclusionary rule can ever apply absent some constitutional violation.")[6]

Here, the "one time in twelve months inspection rule" enacted by Congress

provides a limited, narrowly-circumscribed exception to the requirement that the

ATF otherwise obtain a warrant from a Magistrate.  The notion that gun dealers

are involved in a highly regulated industry, and thus subject to more frequent or

warrantless administrative searches, or otherwise have a diminished expectation

of privacy (as first expressed by the United States Supreme Court in *United*

*States v. Biswell*, 406 U.S. 311 (1972)) has been superseded by Congress in

enacting the rule by reference to the Fourth Amendment in the Congressional

record contemporaneous to the enactment of the FOPA.

Thus, while the general rule is that violation of a statute alone will not

ordinarily support the remedy of suppression, Defendants' violation of the "one

time in twelve months inspection rule" is not simply "precatory" in this instance

because the statute itself is a codification of the Constitutional protections

afforded by Fourth Amendment – *i.e.*, that an inspection conducted without a

warrant in violation of the temporal constraints imposed by the inspection rule is

---

[6] Evidence obtained from a search or seizure that exceeds permissible bounds is "fruit of the poisonous tree" and must be excluded under the Exclusionary Rule.  *Wong Sun v United States*, 371 U.S. 471, 484-85 (1963). The Exclusionary Rule bars admission of any direct or indirect product of illegally-obtained evidence. *Murray v. United States*, 487 U.S. 533, 536-537 (1988); *Nardone v. United States*, 308 U.S. 338, 341 (1939).

18

1  per se "unreasonable" under the Fourth Amendment.

2         Moreover, since evidence seized during an ATF inspection can be used to

3  support a criminal violation of the Gun Control Act (18 U.S.C. § 924), and

4  administrative revocation proceedings result in the loss of a valuable property

5  right (the license), it is appropriate to apply the Exclusionary Rule in this case

6  even though the underlying proceedings were administrative rather than criminal.

7  Analyzing Supreme Court precedent, including *Calandra v. United States*, 414

8  U.S. 338 (1974), *Camara v. Municipal Court*, 387 U.S. 523 (1967), and *One 1958*

9  *Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1965), Professor LaFave has

10  aptly summarized these principles in his seminal treatise, *Search and Seizure:*

11         [T]he exclusionary rule is to be applied to proceedings which are
       quasi-criminal in character in that their object is to penalize for the
12     commission of an offense against the law, such as the loss of a
       license or one's livelihood;

13

14         . . .

15         the argument for exclusion (in an administrative context) is most
       compelling when the administrative agency . . . has an investigative
       function and investigative personnel of that agency participated in
16     the illegal activity for the purpose of providing information to support
       administrative proceedings against the suspect."

17

18  *Id.* at p. 241, § 1.7(f).   Other federal cases are in accord, holding that the

19  Exclusionary Rule is not limited exclusively to criminal proceedings, but should

20  also be applied to administrative proceedings which are quasi-criminal in

21  character.  For example, in *United States v. Blank*, 261 F.Supp.180 (ND Ohio

22  1966), the court applied the Exclusionary Rule to preclude the government from

23  using illegally seized evidence in a civil tax assessment proceeding.  Referencing

24  *One 1958 Plymouth Sedan,* the court reasoned it would be "anomalous" to hold

25  that the evidence seized illegally would only be excludable in criminal

26  proceedings.  *Id.* at 183.

27  ///

28  ///

1       The appropriateness of the remedy of suppression in this case as a

2   deterrent is made manifest by the egregious conduct of the agency, which first

3   violated the inspection rule and then brazenly sought to reinterpret the rule and

4   the applicable evidence of the violation at a hearing it unilaterally controlled.  No

5   one can reasonably argue that the timing of the extraordinary 2003 inspection

6   conducted by Defendants was accidental and that an inadvertent violation of the

7   statute occurred since the testimony was that prior to an inspection, including this

8   one, the inspectors examine the records of the prior inspections to determine

9   when to commence the next review.  *See, Hearing Testimony of ATF Inspector*

10  *Denis Anderson at 320:18-321:20, Exh. M.*  Nor can it be argued that the

11  determination to inspect was made other than in a calculated manner given the

12  number of agents assigned, the effort to gather them from all over the ATF

13  Western region and the fact that they were armed with a letter from the person

14  who would be making the ultimate determination as to whether to revoke.

15  Defendants likewise cannot claim they were unaware of the temporal limitations

16  imposed by the inspection statute (or their ability to obtain an inspection warrant

17  from a judicial officer if they determined to proceed to inspect in less than one

18  year) in view of the newly-minted memorandum, circulated between the time of

19  the 2002 and 2003 inspections, identifying this very issue as an ongoing

20  question.

21      Whatever the ATF employees' intent and purpose in acting, having chosen

22  to attempt to redefine, and thereby virtually cancel, the statutory limit on

23  warrantless inspections, this Court must, to protect the Constitutional right

24  afforded all persons to be free from illegal search and seizure, preserve the

25  integrity of the judicial process and give deference to Congressional intent to

26  specifically limit and govern the right of inspection, suppress the results of the

27  2003 inspection, and the alleged violations, the revocation proceedings, and Final

28  Revocation Notice upon derived therefrom be set aside as a matter of law.

## IV.

## CONCLUSION

There are no genuine issues as to any material facts underlying TRADER SPORTS' claim that Defendants' warrantless 2003 inspection was conducted in violation of the "one time in twelve months inspection rule" codified at 18 U.S.C. § 923(g)(1)(B)(ii).   The Court has the explicit statutory authority under 5 U.S.C. §§ 706(2)(A) & (D) to set aside the revocation as arbitrary, capricious, and contrary to law, and likewise possesses the inherent supervisory authority to suppress the fruits of the unlawful inspection because the  "one time in twelve months inspection rule" itself is a codification of the Constitutional protections afforded by Fourth Amendment for which the remedy of suppression should be applied by reference to the Exclusionary Rule.

Accordingly, TRADER SPORTS is entitled to summary judgment setting aside the unlawful revocation as a matter of law.

Dated:   September 7, 2006

Respectfully submitted,

**SEGAL & KIRBY**

By:     /S/ Malcolm S. Segal
        MALCOLM S. SEGAL
        Attorneys for Plaintiff
        TRADER SPORTS, INC. dba
        THE TRADERS